In August 2001, Daniel W. Fell, Sr., the husband, filed a complaint for a divorce *Page 488 
against Michele Ann Fell, the wife; at that time, the parties had been married for over nine and a half years. In his complaint, the husband sought, among other things, custody of the only child born of the marriage, a daughter. The wife answered the complaint and counterclaimed, also seeking, among other things, custody of the daughter. The husband filed an amended complaint, alleging that the wife had committed acts of domestic violence during the course of the marriage and that, therefore, he should be awarded custody of the daughter.
After an ore tenus proceeding, the Mobile Circuit Court entered a judgment divorcing the parties. The divorce judgment contained a property division (most of which the parties had been agreed to) awarding the wife, among other things, two vehicles, certain items of personal property, and her retirement accounts. The husband was awarded, among other things, one vehicle, certain items of personal property, and his retirement accounts. The divorce judgment further ordered that the marital home be sold and the net proceeds of the sale split equally between the parties (the parties estimated the equity in the marital home to be between $20,000 and $21,000), and each party was ordered to pay specified debts (which basically represented a "50/50" split of the marital debt). The husband was further ordered to pay the wife $3,000 as alimony in gross.
The parties were awarded joint legal custody of the daughter; the wife was awarded primary physical custody. The husband was ordered to pay child support in the amount of $500 per month. He was granted visitation rights that included alternating weekends, a month in the summer, a week at Christmas, specified days during alternating Thanksgiving holidays, specified days during alternating spring school holidays, Father's Day weekend, and other times as agreed on by the parties. The husband was also granted an additional midweek overnight visitation, beginning after school on Wednesdays and ending the following morning by "return[ing] the [daughter] to school."
The record reveals the following facts. The parties began living together during the summer of 1991 and were married in December 1991. At the time of the parties' marriage, the wife had custody of her one-year-old son from a previous marriage, M.H. The husband had a five-year-old son from a previous marriage, D.F.; the husband's former wife had custody of D.F. The parties' daughter was born in July 1993. At the time of the trial (in December 2001), the husband was 40 years old; the wife was almost 36 years old; the daughter was 8 years old; M.H. was almost 12 years old; and D.F. was 16 years old.
At the time of their marriage, the parties were living in the Mobile area in a mobile home owned by the husband. In 1993 or 1994, D.F. began living with the parties and continued living with the parties for approximately 18 months (D.F. then moved to North Carolina to live with his mother).
In 1995 or 1996, the parties moved into a house in Mobile. In November 2000, D.F. returned to live with the parties. In late October/early November 2001 (less than two months before the trial), D.F. moved in with the husband's mother (who also lived in Mobile) on a temporary basis until after the divorce proceedings were concluded, at which time D.F. was to return to live with the husband.[1] *Page 489 
At the time of the trial, both parties continued to live in the marital home. The parties agreed that the party who was awarded custody of the daughter would continue living in the marital home until it was sold.
Both parties presented evidence of domestic violence. The husband and the wife offered conflicting testimony regarding the extent of, and the nature of, violent behavior on the part of the wife. The wife admitted that she had committed between three and five acts of domestic violence against the husband over the course of the marriage. The wife admitted that she had shoved, hit, slapped, kicked (aiming for the groin area), and clawed the husband. The wife testified that she did not recall engaging in any violent behavior before D.F. came to live with the parties in 1994; however, the wife admitted that some of the incidents of violent behavior had occurred when D.F. was not living with them, and that some of the incidents had occurred in front of the children. The wife also admitted that she had slapped the husband across the face on one occasion. Although the husband claimed that the wife had broken his nose on that occasion, he did not have any proof that she had actually broken his nose and the wife denied that she broke his nose. (It appears that this incident occurred sometime after D.F. returned to live with his mother in North Carolina.)
The husband testified as to several other acts of violent behavior on the part of the wife. In addition, the wife admitted that she had pulled a gun on the husband in early 1995, in the presence of D.F. (who was approximately nine years old at the time) and their daughter (who was approximately seven or eight months old at the time). The husband and the wife offered conflicting testimony regarding this incident. The wife testified that the husband and D.F. were arguing while the husband was holding the daughter. The wife testified that she got the gun after the husband refused to give her their daughter. The wife testified that she did not point the gun at the husband and that she voluntarily put the gun down. The wife testified that the gun was not loaded; however, she admitted that she did not advise the husband and D.F. as to whether the gun was loaded. The husband, on the other hand, testified that he and the wife (not he and D.F.) were arguing and that the wife got the gun after he threatened to leave with the daughter. The husband testified that the wife pointed the gun at him, but that ultimately he was able to take the gun away from the wife. D.F.'s testimony regarding that incident was substantially the same as the husband's.
Theresa Ryland, a friend of the parties who had known the parties for approximately eight to nine years, testified that she had observed two incidents where the wife had engaged in violent behavior. Both of the incidents occurred approximately three to four years before the trial. On one occasion while she was in the parties' home, Ryland saw the wife knock a drink out of the husband's hand as the husband was attempting to take a sip of the drink. The wife did not recall that incident. Ryland explained that the wife *Page 490 
became upset because the husband, who had just returned from a Mardis Gras function, had lipstick on his cheek. On the second occasion, Ryland saw the wife swing at the husband during an argument in the football parking lot at the Senior Bowl football game. On that occasion, Ryland's husband was also present; Ryland admitted that all of them had been drinking alcoholic beverages on that occasion. The wife denied that she had swung at the husband, but she admitted that she had shoved the husband and Ryland's husband as well.
The wife testified that the husband drank alcoholic beverages and that sometimes he drank to excess. The wife testified that on one occasion the husband had had a drink in the car with him while he was driving with the family in the car. The wife testified that on another occasion the husband had D.F. (who at the time had a learner's driving permit) drive the husband, M.H., and the daughter home from a function because the husband had had a "few beers." The husband admitted that he drank alcoholic beverages and that if he felt like it was inappropriate for him to drive, he had someone else drive, generally the wife. The wife admitted that she drank alcoholic beverages as well.
The wife testified that she stopped engaging in violent behavior after an incident between the parties during an argument in the spring of 2000. The wife testified that after she shoved the husband, the husband grabbed her arms and pushed her against the wall and told her that he had had enough and that if she were a man he would defend himself and fight her. The husband's testimony regarding that incident was substantially the same as the wife's.
The wife also testified that the husband had pushed her out of D.F.'s bedroom in the summer of 2001 when she had gone into D.F.'s room to remove the stereo equipment after D.F. refused to turn the volume down. (The husband pushed her and told her to leave D.F.'s stereo equipment alone.) The husband's testimony regarding that incident was substantially the same as the wife's.
Both of the parties presented evidence that D.F. had, at times, been a difficult child. The wife testified that D.F. did not respect her and that the relationship between the husband and D.F., as well as the relationship between her and D.F., was a source of frustration for her. The husband testified that when D.F. came to live with the parties the first time, D.F. was having trouble getting along with his mother and he was also having trouble in school.[2] The husband testified that D.F. came to live with them again in November 2000 for the same reasons. At the time of the trial, the husband had obtained physical custody of D.F.; D.F.'s behavior had improved; and D.F. was taking medications (Concerta and Ritalin) to treat his attention deficit disorder and hyperactivity.
The wife testified that the husband had tried to choke D.F. when she, the husband, the daughter, D.F., and M.H. were visiting the wife's mother. The husband testified that this incident occurred when D.F. was visiting; D.F. testified that he was approximately 14 years old at the time. The husband testified that he had pinned D.F. down on the sofa in an effort to discipline him (after D.F. had been disrespectful to *Page 491 
the wife and the wife's mother); the husband denied that he was trying to choke D.F. (D.F.'s testimony regarding this incident was substantially the same as the husband's.)
The wife testified that the husband and D.F. had also gotten into a physical altercation at church in May 2001; however, the wife admitted that she had not witnessed the incident. The husband testified that he was attempting to discipline D.F. for being disrespectful. The husband denied an allegation that he had choked D.F. during this incident. D.F.'s testimony regarding this incident was substantially the same as the husband's. After the altercation, the husband had D.F. committed to the Strickland Youth Facility. (Apparently, D.F. completed some type of disciplinary program in an attempt to add structure to his life.)[3]
D.F. testified that the wife had slapped him a lot when he lived with the parties the first time and that the wife had hit, pushed, shoved, and kicked him on several occasions since he had come to live with the parties the second time. The wife denied that she had slapped D.F. when D.F. lived with them the first time. The wife admitted that after D.F. came to live with them the second time, she had "popped" D.F. in the mouth one or two times for "back-talking" her. D.F. testified that the wife placed M.H.'s face in urine when M.H. was four or five years old because M.H. had wet the bed. The wife denied that she had placed M.H.'s face in urine, but admitted that she had made him sleep on the wet spot. D.F. testified that he had seen the wife slap M.H. and the daughter in the face as well. The wife denied that she had slapped M.H. and the daughter in the face; the husband testified the wife had slapped M.H. in the face in a disciplinary matter for "mouthing-off."
D.F. admitted that he had "whipped" the daughter one time in an effort to discipline her before he was told that it was inappropriate for him to do this. Although the wife admitted that D.F. and the daughter had a good relationship, the wife testified that she was concerned that D.F. might be a negative influence on the daughter. The wife also claimed that D.F. had exhibited aggressive behavior toward the husband and M.H., and that D.F. had threatened the wife's life in front of the daughter.
The wife testified that the husband was involved in a lot of outside activities, which she says, contributed to her frustration.[4] The husband was involved in softball, volleyball, and church activities. (The wife was involved in church activities as well.) The wife testified that because of the husband's work schedule and outside activities, she was left with the responsibility of caring for the children most of the time.
Both of the parties had character witnesses testify on their behalf. The character testimony revealed that both parties are good parents and that no one had ever observed either of the parties acting inappropriately with any of the children. One of the character witnesses testified that *Page 492 
the wife had been attending counseling sessions the last year to address her anger problem. The wife testified that she was attending counseling sessions at the time of the trial.
The wife admitted that the husband was a good father and that he and the daughter had a good relationship. The husband admitted that the wife was a good mother. Both parties admitted that they spanked the daughter on the buttocks as a form of discipline.
The wife testified that she believed she should be awarded custody of the daughter because, she claimed, among other things, she was more patient with the daughter, her work schedule (discussed below) was more conducive to caring for the daughter, and she had stopped engaging in acts of domestic violence in the spring of 2000.
The husband testified that he should be awarded custody of the daughter, among other reasons, because of the wife's propensity for violence and because, he claimed, he had not committed any acts of domestic violence. Although he trusted the wife enough to leave the daughter alone with her while he had an "everyday presence" in the home, he was concerned for the daughter's safety once that "everyday presence" was removed as a result of the divorce. However, the husband admitted that he would not have been leaving the daughter with the "wife every morning if [he] thought [the daughter] was not perfectly safe in her hands."
Both of the parties had family support to help care for the daughter. The wife's father lived with her. (At the time of the trial, the wife's father had been living with the parties for approximately two years.) The husband's mother, his two sisters, and his two brothers also lived in Mobile.
The husband was working as a "team leader of mechanics" for Goodrich Air Structures, earning a base salary of approximately $56,000. In addition to his base salary, the husband also received "vacation pay," "flex dollars" (to be used to cover a portion of insurance premiums), and "gain share" (an annual profit-sharing distribution). A copy of the husband's pay stub was introduced into evidence. The pay stub reflects that, as of October 7, 2001, the husband had received $43,117.12 in regular pay; $1,484.24 in vacation pay; $5,990.04 in flex dollars; and $3,433.10 in "gain share" (which the husband did not expect to receive for 2001 because of the September 11, 2001, terrorist attacks). The husband worked from 6:00 a.m. until 2:30 p.m. five days a week. The husband testified that Goodrich had a company policy that would allow him to modify his work schedule if he was awarded custody of the child.
At the time of the trial, the wife was working as a registered nurse at the Children's Medical Group earning approximately $29,600 per year. The wife worked from 8:45 a.m. until 5:15 p.m. four days a week.
Both parties submitted "CS-42, Child Support Guidelines" forms to the trial court. The forms reflect, among other things, that the husband's monthly income was $5,869 and the wife's monthly income was $2,467, and that the husband paid monthly health, dental, and vision insurance premiums for family/dependent coverage in the amount of $728. The husband's form reflects a recommended child-support order of $423 per month ($1,151 total child-support obligation, adjusted by subtracting $728 for the cost of the insurance premiums) if the wife were to be awarded custody of the daughter. The wife's form reflects a recommended child-support order of $493 (her total child-support obligation) if the husband were to be awarded custody of the daughter. *Page 493 
In its judgment, the trial court found, in part:
 "10. The [wife] shall complete the Parenting Skills Class at the Exchange Club within 60 days. Since the [wife] admits to an anger problem the Court conditions her having primary physical [custody] of the minor child on her completing this course in the time frame set out.
 "11. Although the Court is mindful of the [wife's] admission of anger problems, the Court is also mindful that D.F. has admitted problems and the husband has had problems with D.F. The Court is of the opinion that the child will be better off in the wife's care with [M.H.] present and the husband seeing [the daughter] every Wednesday and the other standard visitation than the child being with the husband in his home. The court believes the [husband] to be an excellent father but believes that [D.F.] will require a great deal of the husband's attention to keep him on the right path and that the child will be in good hands with the wife.
 "12. However, the Court does put the parties on notice that if there is any concern of any harm being caused to the children, they should immediately notify the Court so the proper hearing and orders may be issued.
". . . .
 "17. The husband shall pay the to the wife as child support the sum of $500.00 per month beginning December, 2001, which is a little more than what the guidelines call for, but in light of the insurance covering a child from his previous marriage, this is fair and reasonable in light of the totality of expenses."
The husband filed a motion to alter, amend, or vacate the judgment, alleging that the trial court had erred, in failing to award him primary physical custody of the daughter, in deviating from the child-support guidelines, and in awarding the wife $3,000 as alimony in gross. The trial court held a hearing on the postjudgment motion; no additional evidence was submitted at the hearing. The trial court denied the husband's postjudgment motion. The husband appeals.
The husband first contends that the trial court erred in granting the parties joint custody of their daughter and, particularly, in granting the wife primary physical custody of the daughter, because, he says, the wife committed acts of domestic violence during the marriage and the wife failed to rebut the presumption under § 30-3-131, Ala. Code 1975, that a perpetrator of domestic violence is not the proper party to whom to award custody of a child.[5]
The wife acknowledges in her brief to this court that "[d]uring the trial of the case, [the wife] admitted to three to *Page 494 
five incidences of domestic violence over the course of the [almost] ten-year marriage." The wife also claims that "there were several other incidents over the course of the marriage where she was the victim of domestic violence at the hands of [the husband]" and that she had witnessed episodes of domestic violence perpetrated by the husband against [D.F.]."[6]
 "When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: '"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. . . ."' Ex parte Perkins, 646 So.2d 46, 47
(Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App. 1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App. 1981). In regard to custody determinations, this Court has also stated: `It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.' Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996)."
Ex parte Fann, 810 So.2d 631, 632-33 (Ala. 2001).
In a divorce action between two fit parents, where there has been no prior custody determination and neither parent has voluntarily relinquished custody of the child, the "best interest" of the child is controlling; the parties stand on "equal footing" and no presumption inures to either parent. "'"The trial court's overriding consideration is the children's best interest and welfare."'" Smith v. Smith, 727 So.2d 113,114 (Ala.Civ.App. 1998) (quoting Collier v. Collier, 698 So.2d 150, 151
(Ala.Civ.App. 1997), quoting in turn Graham v. Graham, 640 So.2d 963, 964
(Ala.Civ.App. 1994)).
In considering the best interests and welfare of the child, the court must consider the individual facts of each case:
 "The sex and age of the children are indeed very important considerations; however, the court must go beyond these to consider the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report *Page 495 
and recommendation of any expert witnesses or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose."
Ex parte Devine, 398 So.2d 686, 697 (Ala. 1981).
An exception to the "equal-footing" principle applies where domestic or family violence has occurred, pursuant to the Custody and Domestic or Family Abuse Act ("the Act"), codified at § 30-3-130 et seq., Ala. Code 1975. Pursuant to § 30-3-131, a finding that a parent has committed domestic violence "raises a rebuttable presumption . . . that it is detrimental to the child and not in the best interest of the child to be placed in the sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence." Section 30-3-132, Ala. Code 1975, provides additional factors for a trial court to consider in child-custody cases involving domestic violence. Section 30-3-132
provides, in part:
 "(a) In addition to other factors that a court is required to consider in a proceeding in which the custody of a child or visitation by a parent is at issue and in which the court has made a finding of domestic or family violence the court shall consider each of the following:
 "(1) The safety and well-being of the child and of the parent who is the victim of family or domestic violence.
 "(2) The perpetrator's history of causing physical harm, bodily injury, assault, or causing reasonable fear of physical harm, bodily injury, or assault, to another person."
In Ex parte Fann, our Supreme Court held that the Act does not require a trial court to make a specific finding in its judgment as to whether domestic violence has in fact occurred, nor does it require that the trial court state in its judgment the reasons and findings supporting a conclusion that a parent has perpetrated domestic violence. 810 So.2d at 633-36.
In the case before us, the trial court did not make a specific finding that the wife had committed acts of domestic violence. However, we conclude that there is evidence in the record that would support a finding that the trial court applied the rebuttable presumption under § 30-3-131 against the wife. The trial court specifically found that the wife had "anger problems," and the court required the wife to complete a parenting-skills class as a condition of her having primary physical custody of the daughter and warned the parties to immediately notify the court of any concern of harm to the children.
We also conclude that there is evidence in the record from which the trial court reasonably could find that the wife had rebutted the presumption against her and that the trial court reasonably could have determined that granting the wife joint legal custody, with primary physical custody of the daughter, was in the best interests of the daughter based on the totality of the evidence presented in the case.See generally Jackson v. Jackson, 709 So.2d 46 (Ala.Civ.App. 1997) (recognizing that the presumption under § 30-3-131 can be rebutted).
The evidence is undisputed that after the incident in the spring of 2000, the wife never again committed an act of domestic violence against the husband. The wife testified that she changed her behavior, not because of that incident, but because "[she] knew in [her] heart that it was the wrong thing to do and [she] needed to be a better person." The husband admitted that the wife was a good mother. The evidence in the record supports a finding that the wife had never physically struck the daughter (except for disciplinary *Page 496 
purposes) and that the daughter was safe with the wife. Further, the trial court specifically found that D.F. had problems and that the husband needed to focus his attention on D.F. to keep him on the "right path."
Section 30-3-131 also states that notwithstanding the rebuttable presumption, "the judge, must also take into account, what, if any, impact the domestic violence had on the child." In this case, there was a general consensus among the witnesses' testimony that it was not good for the daughter (or any child) to be exposed to domestic violence. Although the daughter had been present during some of the wife's acts of domestic violence against the husband, there is no evidence in the record that the daughter had been damaged by, or suffered any long-term adverse effects from, the wife's violent behavior towards the husband.
The extent of conflicting evidence in this case is noteworthy and exemplifies the reason for the ore tenus presumption:
 "'The trial court is in the . . . position of discerning the demeanor and other like intangibles which do not transfer so readily in a transcript.' Shepherd v. Shepherd, 531 So.2d 668, 671
(Ala.Civ.App. 1988). Stated another way, `the deference given to the trial court by the ore tenus rule is, in part, due to the trial court's unique position to see and/or hear something that may not be apparent on the face of the written record.' Willing v. Willing, 655 So.2d 1064, 1068 (Ala.Civ.App. 1995). See Dobbins v. Dobbins, 602 So.2d 900, 901
(Ala.Civ.App. 1992) (`The reason for the ore tenus rule is [well established], i.e., that the trial court had the opportunity to observe the witnesses as they testified, to judge their credibility and demeanor, and to observe what this court cannot perceive from a written record.')."
Ex parte Fann, 810 So.2d at 638. We cannot conclude based on the totality of the evidence that the trial court was plainly and palpably wrong in awarding the wife primary physical custody of the daughter.
The husband next contends that the trial court abused its discretion in awarding the wife $3,000 as alimony in gross. In Ingram v. Ingram,602 So.2d 418, 420 (Ala.Civ.App. 1992), this court stated:
 "We first note that the division of marital property in a divorce action is a matter committed to the sound discretion of the trial court. Lucero v. Lucero, 485 So.2d 347 (Ala.Civ.App. 1986). The trial court's decision following the presentation of ore tenus evidence is presumed to be correct, and this court will not reverse that decision absent a gross abuse of discretion. Thomas v. Thomas, 394 So.2d 372
(Ala.Civ.App. 1980). Further, property divisions in a divorce case do not have to be equal, only equitable. Montgomery v. Montgomery, 519 So.2d 525 (Ala.Civ.App. 1987)."
A property division that favors one party over another does not necessarily indicate an abuse of discretion by the trial court. Dobbs v.Dobbs, 534 So.2d 621 (Ala.Civ.App. 1988). "'[P]roperty divisions are not required to be equal, but must be equitable in light of the evidence, and the determination as to what is equitable rests within the sound discretion of the trial court.'" Ex parte Drummond, 785 So.2d 358, 361
(Ala. 2000) (citations omitted.) "Factors to be considered by the trial court in a division of property include the earnings ability of the parties; their future prospects, ages, and health; the duration of the marriage; the source, value, and the type of property; and the conduct of the *Page 497 
parties." Corl v. Corl, 560 So.2d 774, 775 (Ala.Civ.App. 1990); accordCovington v. Covington, 675 So.2d 436, 438 (Ala.Civ.App. 1996) (reciting factors for the trial court to consider in dividing marital property). "The weight or importance assigned to any one of these factors is primarily left to the trial court's discretion when apportioning property." Antepenko v. Antepenko, 549 So.2d 1357, 1359 (Ala.Civ.App. 1989).
In this case, the parties agreed to most of the terms of the property division and left only a few items for the trial court's consideration. The parties were married for almost 10 years. The record is clear that the husband's annual income exceeds the wife's annual income by a minimum of $16,000. In light of the totality of the evidence, we cannot hold that the trial court abused its discretion in awarding the wife $3,000 as alimony in gross.
Finally, the husband contends that the trial court erred in ordering him to pay $500 per month in child support because, he says, the trial court deviated from the child-support guidelines without making a finding that the application of the guidelines would be "manifestly unjust or inequitable." Rule 32, Ala.R.Jud.Admin., provides, in part:
 "(A) . . . There shall be a rebuttable presumption, in any judicial or administrative proceeding for the establishment or modification of child support, that the amount of the award which would result from the application of these guidelines is the correct amount of child support to be awarded. A written finding on the record indicating that the application of the guidelines would be unjust or inappropriate shall be sufficient to rebut the presumption if the finding is based upon:
". . . .
 "(ii) A determination by the court, based upon evidence presented in court and stating the reasons therefor, that application of the guidelines would be manifestly unjust or inequitable.
". . . .
 "(2) Stipulations. Stipulations presented to the court shall be reviewed by the court before approval. No hearing shall be required; however, the court shall use the guidelines in reviewing the adequacy of child support orders negotiated by the parties and shall review income statements that fully disclose the financial status of the parties.
". . . .
"(B). . . .
". . . .
"(7) Health insurance premiums.
 "(a) The actual cost of a premium to provide health insurance benefits for the children shall be added to the `basic child support obligation' and shall be divided between the parents in proportion to their adjusted gross income in the percentages indicated on the Child Support Guidelines form (Form CS-42).
 "(b) The amount to be added to the `basic child support obligation' shall be the actual amount of the total insurance premium for family/dependent coverage, regardless of whether all children covered are in the same family.
 "(c) After the `total child support obligation' is calculated and divided between the parents in proportion to their `monthly adjusted gross income,' the amount added pursuant to subsection (b) shall be deducted from the obligor's share of the total child support obligation, provided the obligor actually pays said premium. If the obligee is actually paying the *Page 498 
premium, no further adjustment is necessary."
(Emphasis added.)
As previously stated, the parties in this case submitted "CS-42, Child Support Guidelines" forms to the trial court reflecting that the husband's child-support obligation would be $423, based on his paying monthly health, dental, and vision insurance premiums for family/dependent coverage totaling $728.[7] Moreover, in Brown v.Brown, 719 So.2d 228 (Ala.Civ.App. 1998), this court held that, pursuant to Rule 32(B)(7)(b), the total cost of the health-insurance premium for family/dependent coverage was to be included in the calculation of the child-support obligation. In Brown, this court found that the husband's argument — that only the portion of the cost attributable to the parties' daughter should be included in the calculation — to be without merit. 719 So.2d at 231.
Consistent with our holding in Brown, we note that Rule 32(B)(7)(b)specifically takes into consideration the fact that a portion of a spouse's insurance premium for family/dependent coverage may also cover children from another marriage. The rule does not provide for an adjustment relating thereto, stating instead that "[t]he amount to be added to the `basic child support obligation' shall be the actual amount of the total insurance premium for family/dependent coverage, regardless of whether all children covered are in the same family." We therefore conclude that the trial court erred in deviating from the child-support guidelines (and in increasing the husband's child-support obligation) based on a finding that "the insurance covers a child from his previous marriage."
That portion of the trial court's judgment regarding child support is reversed, and the cause is remanded for the trial court to recalculate the husband's child-support obligation in accordance with Rule 32, Ala.R.Jud.Admin., consistent with this opinion. The remainder of the trial court's judgment is due to be affirmed.
The wife's request for the award of an attorney fee is denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
[1] The husband testified that he moved D.F. out of the marital home and into the husband's mother's home because of the animosity between D.F. and the wife, and additionally because the wife had alleged, in front of D.F. and M.H., that D.F. had molested M.H. Although the wife did not testify regarding this allegation, the husband testified that the wife admitted during a deposition that she did not have any evidence to support the allegation. The husband further testified that when he asked the wife, "`Why would you say that? Why would you even say that especially around the kids? Why would you want to bring that up?'"the wife responded, "`Because I know what it takes to pull both of y'all's triggers.'"
[2] At some point during D.F.'s 18-month stay with the parties, D.F. attended counseling. Because D.F. was attending counseling, the parties decided to attend marriage counseling as well. During the parties' marriage counseling sessions, the "anger issues" in the parties' marriage were addressed.
[3] The wife also testified that after D.F. had come to live with the parties the second time, the husband, from time to time, would punch D.F. in the arm to discipline him, resulting in a "punching match" between the husband and D.F. The husband admitted that sometimes he punched D.F. in the arm to discipline D.F., but explained that the "punching matches" were just "tussling around." D.F.'s testimony regarding the "punching matches" was substantially the same as the husband's.
[4] The wife admitted that she had kicked the husband's car in anger on one occasion when he was leaving the marital home to participate in a sporting activity. The wife could not recall if that incident occurred before or after the incident in May 2000.
[5] Section 30-3-131 provides:
 "In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic violence has occurred raises a rebuttable presumption by the court that it is detrimental to the child and not in the best interest of the child to be placed in the sole custody, joint legal custody, or joint physical custody with the perpetrator of domestic or family violence. Notwithstanding the provisions regarding the rebuttable presumption, the judge must also take into account, what, if any, impact the domestic violence had on the child."
Section 30-3-133, Ala. Code 1975, provides:
 "In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is in the best interest of the child to reside with the parent who is not a perpetrator of domestic or family violence in the location of that parent's choice, within or outside the state."
[6] Although the wife argues that the trial court reasonably could have concluded that the husband also engaged in acts of domestic violence and applied the § 30-3-131 presumption to him, we do not believe that a reasonable view of the evidence would support that finding.
[7] From our review of the record, we note that it appears to us that $728 represents the husband's cost for four weeks of family/dependent coverage — not his monthly cost. The husband's actual monthly cost for family/dependent coverage would appear to be $789 ($364 biweekly x 26 pay periods, divided by 12 months).