952 So.2d 1131 (2006)
Wendy Downing PATRICK
v.
Mary Anne WILLIAMS.
No. 2050203.
Court of Civil Appeals of Alabama.
May 26, 2006.
Order Overruling Rehearing August 4, 2006.
Certiorari Denied September 19, 2006.
*1133 Garve Ivey, Jr., and Gordon A. Mayfield of Ivey & Ragsdale, Jasper, for appellant.
Submitted on appellant's brief only.
Alabama Supreme Court 1051663.
THOMPSON, Judge.
Wendy Downing Patrick ("the mother") appeals the trial court's judgment awarding Mary Anne Williams ("the maternal grandmother") custody of the two minor daughters ("the children") born of the marriage between the mother and Jeffery Arnold Downing ("the father"). We affirm in part, reverse in part, and remand with instructions.
The trial court divorced the mother and father in 2000. The judgment of divorce, which incorporated an agreement between the mother and father, awarded the mother primary physical custody of the children and awarded the father standard visitation. The divorce judgment also ordered the father to pay child support in the amount of $733 per month. Both the mother and the father have remarried since their divorce.
On October 3, 2004, the mother voluntarily placed the children with the maternal grandmother. The mother and her new husband also voluntarily placed the son born of the marriage between the mother and her new husband with the new husband's mother.[1]
On October 20, 2004, the maternal grandmother filed in the trial court an emergency petition for custody of the children; the trial court granted that petition that same day. On October 25, 2004, the father filed a response to the maternal grandmother's emergency petition for custody. The father's response asserted that the mother was addicted to methamphetamine and that he, rather than the maternal grandmother, should be awarded custody of the children.
On November 10, 2005, the father, alleging that there had been a material change in circumstances, requested that the trial court modify the judgment of divorce and award him custody of the children.[2] That *1134 same day, the father filed a petition for a rule nisi in which he alleged that the mother had prevented him from visiting with the children and, therefore, that she should be held in contempt.
The maternal grandmother and the father entered into a pendente lite agreement. On November 23, 2004, the trial court entered a pendente lite order that was based on the agreement between the maternal grandmother and the father. That order awarded the maternal grandmother pendente lite custody of the children, outlined a visitation schedule for the father, and directed that the mother could have supervised visitation with the children. On December 6, 2004, the mother filed a response to the father's petition to modify custody and his petition for a rule nisi. That same day, the mother also filed a counterpetition for a rule nisi in which she alleged that the father was $29,302.69 in arrears on his child-support obligation. The mother also filed a petition to modify the judgment of divorce to increase the father's child-support obligation based on her allegation that the father had realized an increased income since the divorce.
On February 1, 2005, the maternal grandmother amended her petition for custody. Among other things, the amended petition added a dependency claim as to both of the children.[3] On February 10, 2005, the trial court entered an order setting the matter for a final hearing, leaving the November 23, 2004, pendente lite order in full effect until the final hearing, and ordering the mother to pay $200 per month and the father to pay $300 per month to the maternal grandmother in child support.
On June 1, 2005, the trial court conducted an ore tenus hearing, at which all of the parties and several members of the children's extended family were present. After the hearing, the trial court found the father to be in contempt of court and ordered him jailed as a result of his being more than $30,000 in arrears on his child-support payments.
On September 8, 2005, the trial court entered a judgment awarding the maternal grandmother custody of the children. In its judgment, the trial court found that the father had had no contact with the children for three years, that the father was in contempt due to his substantial child-support arrearage, and that the father had abandoned the children. The judgment also found that the mother's addiction to methamphetamine had exposed the oldest child to a potentially fatal ingestion of the drug and that the mother could offer no *1135 credible story to explain the ingestion. The trial court found both the mother and the father "unfit to fulfill the duties and responsibilities of a natural parent at this time," and it therefore awarded custody of the children to the maternal grandmother. The trial court also gave the parties leave to file "properly documented proposals for child support according to the child-support guidelines, and provisions for visitation for the natural parents."
On October 4, 2005, the mother filed a "postjudgment motion," which the trial court denied on October 12, 2005. On October 24, 2005, the trial court entered an order that directed the father to pay $571 per month in child support and directed the mother to pay $190 per month in child support. The mother timely appealed; the father has not appealed.
The testimony at the hearing revealed the following pertinent facts. Soon after her divorce in 2000, the mother remarried and moved with her new husband and the children to La Grange, Georgia. The mother, her new husband, and the children moved to Texas in 2002. Since moving to Texas, the mother has been a stay-at-home parent, and the new husband has worked with computers in the automotive industry.
Since the divorce, the father has lived in Montgomery, Dothan, and Panama City, Florida; he has worked continuously as a service technician for a cable-television provider. At all times relevant to this appeal, the maternal grandmother, a retired nurse, has lived in Tallapoosa County.
The mother testified that the father exercised visitation with the children soon after the divorce but that his visits became increasingly less frequent and he eventually stopped visiting the children all together. The father claimed that the mother had prevented him from exercising visitation with the children, but the mother disputed that claim. There was no dispute, however, that the father went approximately two years without visiting the children and did not attempt to have the trial court order the mother to allow him to see the children during that time. The evidence indicated that the mother had encouraged the children to visit with members of the father's family; the father's parents and his sister had traveled to Texas to see the children, and the mother regularly brought the children to Alabama to see those family members.
The mother claimed that the father had not paid his child-support obligation for approximately two and one-half years. According to the mother, the father was $28,937.69[4] in arrears on his child-support obligation, he owed $7,800 in statutory interest on that arrearage, and he owed $3,281.79 for the children's medical expenses. The father did not dispute the amounts offered by the mother. He testified that, despite his having been continuously employed, he began missing child-support payments in October 2002 because he was "holding a grudge" and "being pig-headed." The father stated that he was upset with the mother for preventing him from seeing the children and, therefore, he stopped making his child-support payments.
The mother asserted that, during their marriage, the father had been physically abusive to her. She also described the father as belonging to a white-supremacist group. The father denied belonging to such a group, but he admitted to being interested in white-supremacist activity while he was in high school.
*1136 The father's new wife testified that the father loved the children and that he had moved from Florida to Montgomery in late 2004 in order to be closer to the children. The maternal grandmother testified that the father had been exercising regular visitation since the children had returned to Alabama. The maternal grandmother also stated that the father was current on his $300 per month pendente lite child-support obligation to her. The mother, however, had missed several of her pendente lite child-support payments to the maternal grandmother.
By all accounts, the mother had been a loving parent until she became addicted to methamphetamine. The mother testified that she and her new husband tried the drug for the first time while on vacation in Hawaii in 2002. She described her use of the drug as sporadic at first, but that it became more and more regular as the months passed. The mother testified that, by late summer of 2004, she and her new husband were smoking "an eight-ball per week"; her new husband described their using one gram of methamphetamine per day. Her new husband stated that one gram of methamphetamine cost approximately $40.
The mother and her new husband testified that, when using methamphetamine, they would typically leave the children with a babysitter after the children had gone to bed, go to a dance club to purchase the drugs, and then go to a motel to smoke the drugs. They would then stay at the motel until they were sober enough to drive, usually returning home between 4 a.m. and 6 a.m. the next morning. According to the mother's new husband, the couple had also experimented with the drug "ecstasy." The mother and her new husband testified that they hid their drugs in their garage and that they had, on a handful of occasions, smoked methamphetamine at their home while the children were asleep. The mother and her new husband testified that the children were making good grades while they lived in Texas and that, for the most part, the mother and her new husband's drug use did not adversely affect the children.
However, on October 1, 2004, the oldest child, then age seven, was admitted to the hospital for what was later determined to be an ingestion of methamphetamine. Despite repeated questions by the attorneys and the trial court, neither the mother nor her new husband could offer an explanation as to how the child came into contact with the narcotics; the mother did, however, state, without qualification, that the incident was her fault. Within hours of learning that the child was in the hospital, the children's maternal grandparents traveled to Texas to be at the child's bedside.[5]
Once the hospital staff discovered that the child had ingested methamphetamine, they contacted the Texas Department of Regulatory Services' Child Protective Services ("CPS").[6] CPS confronted the mother about her drug use, and the mother admitted that she was addicted to methamphetamine. CPS suggested that the maternal grandmother take the two children at issue in these proceedings and that the new husband's mother take the son while the mother and her new husband received treatment for their addictions. There does not appear to have been a judicial proceeding in Texas in which a Texas court exercised jurisdiction over the *1137 children. The parties' attorneys described the event as "voluntary," and one in which Texas's "jurisdiction was never invoked."[7]
In order to voluntarily place the children and the mother and her new husband's son with their respective grandparents (as part of a safety plan), the mother and her new husband completed forms provided by CPS. A CPS social worker assisted the mother and her new husband as they completed the forms necessary to temporarily place the children in the care of the maternal grandmother.
Within days of the oldest child's release from the hospital, the maternal grandmother returned to Alabama with the children while the mother and her new husband entered a drug-treatment facility. The mother completed 21 days of treatment and has submitted to regular drug-screen tests; she has not tested positive for a controlled substance since the incident involving the oldest child. The mother testified that she has been actively participating in after-care and 12-step programs. The mother's new husband remained in treatment for only approximately six days. He claimed at the hearing that he has remained sober since the incident with the oldest child; he has also submitted to drug-screen tests and has not tested positive for drug use. The mother and her new husband both passed a hair-follicle test conducted at the end of the hearing in this matter.
The maternal grandmother admitted that she and the mother had had disagreements over the years and that, when she was 16 years old, the mother moved out of the maternal grandmother's home because of a dispute involving an automobile. Despite their past problems and the troubles arising from the mother's addiction, the maternal grandmother testified that she loved the mother; the maternal grandmother stated, however, that she did not love the mother's new husband.
The maternal grandmother described the mother's new husband as being a negative influence in the mother's life. The maternal grandmother also stated that she had serious doubts about the new husband's claimed sobriety; the maternal grandfather expressed similar concerns. The maternal grandfather testified that he was "gravely concerned" about the children returning to the mother's home because of his doubts regarding the new husband's sobriety. There was also evidence indicating that the mother's new husband suffered from depression and that, on at least one occasion, he had attempted to commit suicide. After the hearing in this matter, the guardian ad litem recommended that the maternal grandmother receive custody of the children.
It is well settled that when a trial court receives ore tenus evidence in a child-custody-modification proceeding and bases its judgment on its findings of fact, that judgment will not be reversed absent an abuse of discretion or a showing that the findings are plainly and palpably wrong. Smith v. Smith, 865 So.2d 1207, 1209 (Ala.Civ.App.2003). See also West v. Rambo, 786 So.2d 1138, 1140 (Ala.Civ.App. 2000). A judgment based on ore tenus evidence is presumed to be correct and will be affirmed if supported by competent evidence. N.G. v. L.A., 790 So.2d 262, 265 (Ala.Civ.App.2001). The trial court's opportunity to observe witnesses is especially important in child-custody cases because the trial court is in the unique position to *1138 directly observe the witnesses and to assess their demeanor and credibility. Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ.App. 2003). However, when this court is presented with an issue of law, we review the judgment of the trial court de novo, without affording it any presumption of correctness. See Barber v. Moore 897 So.2d 1150, 1153 (Ala.Civ.App.2004).
The mother raises three issues on appeal; we address each issue separately. First, the mother argues that the trial court lacked subject-matter jurisdiction to modify the custody of the children.[8] We disagree.
"The Parental Kidnapping Prevention Act ('PKPA'), 28 U.S.C. § 1738A, and Alabama's version of the Uniform Child Custody Jurisdiction and Enforcement Act (`UCCJEA'), codified at Ala.Code 1975, § 30-3B-101 et seq., govern when a state has jurisdiction to decide a child-custody issue. The PKPA states that continuing jurisdiction remains in a state that has made a child-custody determination provided that the state continues to have jurisdiction under the state's laws and the child or at least one `contestant' resides in that state. 28 U.S.C. § 1738A(d); see also Holloway v. Holloway, 519 So.2d 531, 532 (Ala.Civ.App. 1987)."
M.J.P. v. K.H., 923 So.2d 1114, 1116 (Ala. Civ.App.2005). The Parental Kidnapping Prevention Act ("PKPA") defines a "contestant" as "a person, including a parent or grandparent, who claims a right to custody or visitation of a child." 28 U.S.C. § 1738A(b)(2).
Under the PKPA, the trial court retained continuing jurisdiction to modify the children's custody so long as it retained jurisdiction under the laws of Alabama and at least one of the contestants continued to live in Alabama. 28 U.S.C. § 1738A(d). The maternal grandmother has lived in Tallapoosa County at all times relevant to this appeal, and she meets the criteria outlined in the PKPA to be a "contestant" because she is a person claiming a right to custody of the children. See 28 U.S.C. § 1738A(b)(2). Therefore, our analysis next turns to whether the trial court could, under Alabama's version of the Uniform Child Custody Jurisdiction and Enforcement Act (" the UCCJEA"), exercise continuing jurisdiction to modify the children's custody. 28 U.S.C. § 1738A(d).
In order to exercise continuing jurisdiction over the matter, the trial court must have had jurisdiction to make an initial custody determination. The UCCJEA defines "initial determination" as "[t]he first child custody determination concerning a particular child." § 30-3B-102(8), Ala. Code 1975.
Section 30-3B-201 of the UCCJEA summarizes when a court of this state has jurisdiction to make an initial custody determination:
"(a) Except as otherwise provided in Section 30-3B-204, a court of this state has jurisdiction to make an initial child custody determination only if:
"(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of *1139 the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state."
The trial court divorced the mother and father; thus, it was the first court to make a determination regarding the custody of the children. At the time of the divorce, the mother, the father, and the children all resided in Alabama; Alabama was the children's home state. None of the parties dispute that the trial court had subject-matter jurisdiction to make the initial custody determination regarding the children as part of the divorce judgment. See § 30-3B-201, Ala.Code 1975.
Section 30-3B-202 provides when a court of this state has continuing jurisdiction of a custody case:
"(a) Except as otherwise provided in Section 30-3B-204, a court of this state which has made a child custody determination consistent with Section 30-3B-201 or Section 30-3B-203 has continuing, exclusive jurisdiction over the determination until:
"(1) A court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or
"(2) A court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state."
The UCCJEA defines "person acting as a parent" as "[a] person, other than a parent, who:
"a. Has physical custody of the child or has had physical custody for a period of six consecutive months, including any temporary absence, within one year immediately before the commencement of a child custody proceeding; and
"b. Has been awarded legal custody by a court or claims a right to legal custody under the law of this state."
§ 30-3B-102(13), Ala.Code 1975 (emphasis added). The Official Comment to § 30-3B-102 notes that "[t]he term `person acting as a parent'. . . . has been broadened . . . to include a person who . . . currently has physical custody of the child."[9]
At the commencement of these proceedings, the maternal grandmother had physical custody of the children and was claiming a right to their custody. Thus, she met the definition in the UCCJEA of a person acting as a parent. See § 30-3B-102(13), Ala.Code 1975. Because the maternal grandmother was a person acting as a parent, and because the maternal grandmother continued to reside in Alabama, the trial court retained jurisdiction to modify custody of the children under § 30-3B-202(a)(2).
The evidence indicates that the children also have a significant connection to Alabama. *1140 Notably, it was the mother who agreed to send the children to live with the maternal grandmother. In addition, other evidence presented at the hearing indicated that the children have maintained close relationships with both sides of their extended family who live in Alabama. The father's sister, an Alabama resident, testified that she spent an entire month visiting the children in Texas, and the mother brought the children to Alabama to see various members of both sides of their family on a regular basis. Further, the maternal grandmother and maternal grandfather were at the oldest child's bedside in Texas within hours of learning that she had been hospitalized. All of this evidence, taken together, indicates that the children have enjoyed close familial connections with several of their relatives living in Alabama. Moreover, the father had recently moved back to Alabama after the children returned to the state.
Likewise, there was available in this state substantial evidence regarding the children's care, protection, training, and personal relationships. The mother, the father, the mother's new husband, the maternal grandparents, and members of the father's family gave extensive testimony regarding the children's well being and the care provided to them by the mother, the father, and the maternal grandmother. The witnesses described in detail the mother's and her new husband's drug addictions, the effect their addictions had on the children, the father's failure to provide support for the children, and the children's performance in school. Based on the detailed testimony presented at the hearing, we conclude that there was sufficient evidence available in Alabama concerning the children's care, protection, training, and personal relationships for the trial court to retain jurisdiction under § 30-3B-202(a)(1). We find that the trial court had subject-matter jurisdiction under both the PKPA and the UCCJEA to decide the issues in these proceedings and that the mother has failed to demonstrate error as to this issue.
The mother next argues that the trial court erred by awarding custody of the children to the maternal grandmother. We disagree. The controlling consideration in child-custody matters is always the best interests of the child; to that end, the trial court is given wide discretion in awarding custody and establishing visitation. Murphree v. Murphree, 579 So.2d 634, 636 (Ala.Civ.App.1991).
"It is well settled that a natural parent has a prima facie right to custody of his or her child as against a nonparent. Ex parte Terry, 494 So.2d 628 (Ala. 1986); Ex parte Mathews, 428 So.2d 58 (Ala.1983). Our courts have supported the presumption in favor of the natural parent, even as against grandparents. Ex parte Woodfin, 596 So.2d 918 (Ala. 1992). This presumption recognizes that, as a matter of law, the best interests and welfare of the child are served by maintaining parental custody. Terry, 494 So.2d 628. Under the standard delineated in Terry, the presumption may be overcome only by proof that the natural parent `is guilty of such misconduct or neglect to a degree rendering that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.' Id. at 632."
Wright v. Wright, 602 So.2d 421, 423 (Ala. Civ.App.1992). Absent a voluntary forfeiture of custody or a prior judgment removing custody from a parent and awarding it to a nonparent, a court cannot award a nonparent custody of a child at the request of that nonparent without first making an express determination that the parent opposing the request is "unfit." H.E.B., Jr. v. J.A.D. 909 So.2d 840, 842-43 (Ala.Civ. *1141 App. 2005). Any finding that a parent is unfit must be based on clear and convincing evidence. Ex parte Terry, 494 So.2d 628, 633 (Ala. 1986).
The mother advances two arguments relating to this issue. First, the mother asserts that her temporarily granting the maternal grandmother custody after the oldest child was hospitalized did not rise to the level of relinquishment required to overcome a natural parent's prima facie right to custody. The mother also contends that the trial court erred by finding the mother "unfit to fulfill the duties and responsibilities of a natural parent at this time." We address each argument separately.
This court has previously held that a father's agreeing to his children being temporarily placed with the children's maternal grandparents did not, by itself, overcome his prima facie right to custody of his children. Wright v. Wright, 602 So.2d at 423. In this case, in order to transfer custody to the maternal grandmother, the mother signed a CPS form; the wording of that form suggests that the mother considered the placement to be temporary. Further, there was no judicial procedure in Texas through which the mother lost custody. We agree with the mother that the temporary placement of the children with the maternal grandmother was, by itself, not sufficient to overcome the strong presumption afforded natural parents in custodial matters. We cannot agree, however, with the mother's second argument relating to this issue.
The trial court based its custody decision on its determination that the mother was "unfit to fulfill the duties and responsibilities of a natural parent at this time." The mother argues that the trial court erred in reaching that conclusion. In Wright v. Wright, supra, this court noted that, absent voluntary relinquishment of custody, a parent's prima facie right to custody could be overcome only "by proof that the natural parent `is guilty of such misconduct or neglect to a degree rendering that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" 602 So.2d at 423 (quoting Ex parte Terry, 494 So.2d at 632).
In this case, the trial court was presented with undisputed evidence indicating that the mother's drug addiction exposed the oldest child to a potentially fatal ingestion of methamphetamine. The mother and her new husband testified that they were smoking the drugs on a regular basis, sometimes in the home while the children were asleep. The mother and her new husband admitted that they had hidden the drugs in the garage, but neither of them could offer an explanation as to how the oldest child came into contact with the drugs. Though the mother and her new husband may have attempted to minimize the effect their drug addictions had on the children, there was no dispute that their addictions could have cost the oldest child her life.
The mother and her new husband claimed that they had quit using drugs and that at the time of the hearing they had been sober for eight months. Both the mother and her new husband had passed several drug-screen tests and were attending 12-step programs. The trial court, however, heard undisputed testimony regarding the extreme difficulties encountered by people recovering from an addiction to methamphetamine. Further, the maternal grandparents both expressed serious concerns regarding whether the mother's new husband was sincere in his efforts to remain sober. The maternal grandfather testified that he never received a believable answer as to how the oldest child could have ingested the drugs *1142 and that he was "gravely concerned" about the children returning to the mother's home.
The trial court had the opportunity to observe the witnesses and hear their testimony. Therefore, it was the province of the trial court, rather than this court, to judge the credibility of those witnesses. Fell v. Fell, 869 So.2d at 494. We cannot say that the trial court's determination that the mother was "unfit to fulfill the duties and responsibilities of a natural parent at this time" and, therefore, that it was in the children's best interest for custody to be vested with the maternal grandmother was unsupported by the evidence. See Ex parte Terry, supra; H.E.B., Jr. v. J.A.D., supra; J.W. v. D.W., 835 So.2d 206, 210-11 (Ala.Civ.App. 2002); and Wright v. Wright, 602 So.2d at 423. After a complete review of the record on appeal, we conclude that the trial court did not plainly and palpably err by determining that the mother was unfit to discharge her parental duties.
The mother next argues on appeal that the trial court erred to reversal by not entering a judgment as to the father's child-support arrearage.[10] We agree. "Past due installments of child support create a final monied judgment therefor. Child support payments that mature before the filing of a petition are immune from change." O'Neal v. O'Neal, 532 So.2d 649, 650 (Ala.Civ.App. 1988) (citations omitted). While it is within the discretion of the trial court to modify the amount of child support due in the future, the trial court may not release or discharge child-support payments once they have matured and become due under the original divorce judgment. Frasemer v. Frasemer 578 So.2d 1346, 1348 (Ala.Civ. App. 1991) (citing Mann v. Mann, 550 So.2d 1028 (Ala.Civ.App. 1989)).
"Where the obligated parent has failed to make child support payments because of financial inability to do so, the trial court may properly find the parent not in contempt, Patterson v. Gartman, 439 So.2d 171 (Ala.Civ.App. 1983), but the trial court may not `forgive' or set aside the accrued arrearage. State Dep't of Human Resources v. Hulsey, 516 So.2d 720 (Ala.Civ.App. 1987)."
Frasemer v. Frasemer, 578 So.2d at 1349.
In this case, the trial court discussed in great detail with the parties' attorneys and the guardian ad litem the amount of the father's arrearage. That discussion included a calculation of the arrearage, the statutory interest that had accrued on the arrearage, and the amount of past-due medical expenses owed by the father. The trial court went so far as to enunciate a figure that it seems to have concluded was the amount of the father's arrearage. The trial court also held the father in contempt and ordered him jailed. Thus, the trial court did not fail to address the issue of the father's arrearage; it did, however, fail to enter a monetary judgment as to the father's arrearage.
When the trial court failed to enter a monetary judgment as to the father's child-support arrearage, it, in effect, erroneously eliminated the final judgments for past-due support. See Frasemer v. Frasemer, supra; see also O'Neal v. O'Neal, supra (holding that a trial court's failure to enter a monetary judgment as to a party's child-support arrearage amounted to reversible error). Accordingly, we reverse the trial court's judgment as to this issue, and we remand this matter to the trial *1143 court to enter a monetary judgment as to the father's child-support arrearage. We affirm all other aspects of the trial court's judgment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, P.J., and PITTMAN, J., concur.
MURDOCK, J., concurs in part and dissents in part, with writing, which BRYAN, J., joins.
MURDOCK, Judge, concurring in part and dissenting in part.
Our law recognizes a very strong presumption in favor of a natural parent's right to the custody of his or her own child. Ex parte Mathews, 428 So.2d 58, 59 (Ala. 1983); and Ex parte Berryhill, 410 So.2d 416, 417 (Ala. 1982) (quoting Ex parte Sullivan 407 So.2d 559, 563 (Ala. 1981), quoting in turn Striplin v. Ware, 36 Ala. 87, 89-90 (1860)). In addition, a judicial decision to remove a child from the custody of its natural parent must be based on clear and convincing evidence. See Ex parte Terry, 494 So.2d 628 (Ala. 1986). The trial court's judgment does not expressly indicate that it applied either of those principles in the present case. Yet, in the absence of an indication otherwise, our precedents call for us to assume that the trial court did so.
Nonetheless, I question whether the evidence in this case rises to the level sufficient to establish in a clear and convincing manner that the mother is unfit to have custody of her children. To begin with, I am not persuaded that the concerns expressed by the maternal grandparents regarding the mother's new husband's sobriety are sufficient, when considered with other evidence in the record, to clearly and convincingly establish the mother's unfitness. The mother has successfully completed various drug-treatment programs and has passed every drug test administered to her during the eight months before trial. If the trial court's judgment is affirmed, the so-called "McLendon presumption" will likely become a serious impediment to the mother ever regaining custody of her children, even if she remains drug-free. See Ex parte McLendon, 455 So.2d 863, 866 (Ala. 1984). Given the strength of the presumption in favor of a natural parent, I believe we must err on the side of the mother in this particular case. I therefore respectfully dissent as to that portion of the main opinion affirming the trial court's custody award.
I concur in all other aspects of the main opinion.
BRYAN, J., joins.

On Application for Rehearing
THOMPSON, Judge.
APPLICATION OVERRULED.
CRAWLEY, P.J., and PITTMAN, J., concur.
MURDOCK, J., dissents, with writing.
BRYAN, J., dissents, without writing.
MURDOCK, Judge, dissenting.
I dissent as to the overruling of the application for rehearing in this case for the same reason I dissented in part to the opinion of this court on original deliverance. I write separately on rehearing to note that, although I originally concurred in that portion of the main opinion that addressed subject-matter jurisdiction, upon further consideration of that matter on rehearing, I would now concur only in *1144 the result reached by the main opinion as to that issue.
NOTES
[1] The son's custody is not at issue in this appeal; he has since been returned to the custody of the mother and her new husband.
[2] We note that throughout these proceedings various pleadings, such as the maternal grandmother's petition for emergency custody, were designated with a case-number suffix of ".01" and other pleadings, such as the father's petition for modification of custody, were designated with a case-number suffix of ".02." Despite the use of different case-number suffixes, the trial court's disposition of the matter leaves no doubt that it consolidated the two actions. For example, the trial court's judgment, which grants custody of the children to the maternal grandmother, is designated with a case-number suffix of ".02," but the judgment references the maternal grandmother's emergency petition for custody that was designated with a case-number suffix of ".01."
[3] At the hearing in this matter, the trial court entered into a discussion with the guardian ad litem for the children and the parties' attorneys. That discussion was prompted by the suggestion of the guardian ad litem that the juvenile court, rather than the circuit court, was the appropriate forum in which to resolve the dependency issue. The trial court acknowledged that it lacked subject-matter jurisdiction to hear a dependency issue, and, though it never expressly ruled on the matter, it took the dependency issue "under advisement." The trial court's disposition of the issues in this case suggests, however, that it concluded that this was a custody dispute rather than a dependency proceeding. See J.A.P. v. M.M., 872 So.2d 861, 866 (Ala.Civ. App.2003) (holding that the case was more in the nature of a custody proceeding than a dependency proceeding despite some of the pleadings being styled as though they pertained to "dependency" matters).
[4] We note that in her counterpetition, the mother alleged that the father was $29,302.69 in arrears; however, in her testimony she stated that he was $28,937.69 in arrears.
[5] We note that, despite their traveling to Texas together when the oldest child entered the hospital, the maternal grandparents have been divorced for a number of years.
[6] CPS appears to serve an analogous function to the Alabama Department of Human Resources regarding children.
[7] As far as this court can determine, the divorce judgment was likewise never domesticated in Texas.
[8] We note that the mother never raised the issue of subject-matter jurisdiction before the trial court. However, "`"[j]urisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu."'" Boykin v. International Paper Co., 777 So.2d 149, 150 n. 1 (Ala.Civ.App. 2000) (quoting Wallace v. Tee Jays Mfg. Co., 689 So.2d 210, 211 (Ala.Civ.App.1997) (quoting in turn Nunn v. Baker, 518 So.2d 711, 712 (Ala.1987))).
[9] We note that, although each state's version of the UCCJEA may vary from that of other states, there appears to be at least a modicum of uniformity as to the definition of "person acting as a parent" covering at least parents and grandparents who currently have custody of a child. See, e.g., In re Oates, 104 S.W.3d 571, 577 (Tex.Ct.App.2003) (excluding from meeting the definition of "person acting as a parent" grandparents who no longer had custody of a child at the time of a hearing but acknowledging that the grandparents would have qualified, under Texas's version of the UCCJEA, as "persons acting as a parent" during a three-month period in which they did have custody); see also Adoption House, Inc. v. A.R., 820 A.2d 402, 409 (Del.Fam.Ct. 2003) (citing 13 Del.Code § 1902(13)).
[10] We note that the father was not listed as an appellee on the notice of appeal and that the father has not filed a brief with the court.