Amy M. Knight Bishop ("the mother") appeals from the judgment of the Montgomery Circuit Court ("the trial court") modifying the custody of James Knight, the oldest son born of the marriage between the mother and Mark D. Knight ("the father"). We reverse and remand. *Page 162 
The parties were divorced in 1997 by the Elmore Circuit Court. Among other things, the divorce judgment, which incorporated an agreement of the parties, awarded the parties joint legal custody of their children, James Knight and Colton Knight (collectively "the children"), with the mother receiving primary physical custody of the children. The divorce judgment awarded the father "reasonable" visitation with the children and ordered him to maintain life insurance for the benefit of the children in the amount of $80,000, to be responsible for 50% of the children's medical expenses not covered by insurance and 50% of the children's school costs, and to pay the mother $600 per month in child support.
On May 3, 2005, the father filed in the Elmore Circuit Court a petition to modify custody of James; that court transferred the case to the trial court on June 15, 2005. On August 11, 2005, the mother answered the father's petition to modify James's custody by denying the father's claims. That same day, the mother also filed a counter-petition to modify custody of the children by requesting that she be awarded sole custody of the children. The mother also requested that the father's child-support obligation be increased and that the father be held in contempt for his failure to maintain life insurance for the benefit of the children and for his failure to pay for 50% of the children's medical and school costs, as directed by the divorce judgment.
On November 3, 2005, the trial court conducted an ore tenus hearing. On November 23, 2005, the trial court entered a judgment in which it, among other things, awarded custody of James to the father, reduced the father's monthly child-support obligation to $112.46, ordered the mother to attend counseling with Colton, set a visitation schedule for the father and Colton, directed the mother and James to "move slowly" toward regular visitation, and expressed "grave concern" for Colton's "permanent psychological and physical" well-being as a result of his continuing to reside with the mother. The trial court's judgment also denied all of the claims asserted by the mother in her counterpetition. On December 22, 2005, the mother filed a postjudgment motion requesting that the trial court amend the visitation schedule it had set for the upcoming Christmas holiday. After the father filed a response, the trial court denied the mother's postjudgment motion. The mother timely appealed to this court.
The record reveals the following pertinent facts. The mother remarried in 2001; she and her new husband, Randall Bishop, divorced in 2002. The mother testified that they divorced so that liability for Bishop's previous tax problems would not attach to the mother; she said that they planned to remarry "on [their] anniversary." Despite their having divorced in 2002, the mother and Bishop have lived together as husband and wife since their marriage in 2001.
James lived in Montgomery in the mother and Bishop's house; Colton, who was 13 years old at the time of the hearing, also lived in that house. Bishop's son from a previous marriage also occasionally stayed at the mother and Bishop's house. James, Colton, and Bishop's son each had his own bedroom at the house. At the time of the hearing, James was 15 years old and in the 10th grade. He had begun attending a new school approximately three months before the hearing, and, according to James and the mother, he was making good grades, with the exception of one "D."
The father had been married twice since his divorce from the mother. At the time of the hearing, he was living with his third wife in Prattville. Also living in the house *Page 163 
with the father and his third wife were her 13-year-old son and her 7-year-old daughter. Because the father's house had three bedrooms, James would have to share a room with his 13-year-old step-brother if he moved to the father's house. James testified that he and his stepsiblings were very close.
Because the judgment of divorce had granted the father "reasonable visitation" with the children, the mother and the father had developed a visitation schedule under which the father had the children every other weekend. Though the father could have picked up the children every other Friday evening, he typically did not pick them up until Saturday evening because he worked on Saturdays. Likewise, the father, on occasion, had not picked up the children at all because he did not have enough money to afford the gas required to drive from Prattville to Montgomery. The father did not dispute the mother's claims that he had not requested to receive more visitation with the children and that he was often late making his child-support payments. Also, the father did not typically visit, call, or give presents to James on his birthday.
The mother testified that the father had been physically abusive to her during their marriage and that he had injured the children or failed to obtain medical care for them when they were injured. The mother stated that the father had dislocated James's shoulder when the child was approximately two years old because James had an accident while being "potty trained." The mother testified that, despite James's constant crying, the father had left James unattended for several hours and she had had to take him to the hospital as soon as she returned from work. The mother also testified that, approximately three years before the hearing, when the father returned the children to her house after a visitation, Colton's arm was broken. Apparently, he broke his arm while playing on a trampoline, and the father neither took Colton to the hospital nor informed the mother about his accident. The mother stated that she suspected something was amiss because, when the father returned the children, Colton was wearing a long sleeve shirt, despite the weather being very warm. According to the mother, she immediately took Colton to the hospital. The father did not dispute the mother's claim that he had been physically abusive toward her during their marriage or her descriptions of either event involving the injuries of the children.
The father asserted that he was seeking the modification of James's custody for two interrelated reasons. First, the father stated that James wanted to have his custody modified. The father testified that he was not seeking to have Colton's custody modified because Colton had not asked him to do so. According to the father, Colton did not want to upset the mother. The father testified that, in his opinion, James and Colton had reached the appropriate level of maturity to determine where they should live. The father further stated that, if James came to live with him, he would consent to James's returning to the mother's custody if he decided that he wanted to return at a later date.
James's primary reason for wanting to live with the father was because he did not like the style of discipline employed by the mother. The father was also seeking to have James's custody modified because, he said, he was concerned about the style of discipline the mother employed when James misbehaved. The trial court heard extensive testimony regarding the mother's disciplining James. *Page 164 
When James was in the 9th grade, he began experiencing disciplinary problems at school. During that year, James was reprimanded at least five times for misbehaving on the school bus, and he was actually suspended from riding the school bus twice. After his first suspension from riding the school bus, the mother warned him that if he was suspended again he would be forced to walk to and from school. After James's second suspension, the mother informed James that he was going to walk to school, as she had warned.
For the duration of his suspension, which lasted approximately three days, James walked the approximately three miles each way to and from school. He testified that it took him approximately one hour to make the trip. He also stated that, at least once, one of his friends accompanied him on the trip "for exercise" and that one of his teachers picked him up one day and gave him a ride.
The father did not think that the mother should have made James walk to school. The father stated that he would have "just kept trying [his] best," rather than making James walk to and from school. The mother, on the other hand, was unapologetic; she asserted that making James walk to school was an "appropriate" type of punishment for a 15-year-old child who had been suspended from riding the school bus for a second time. One of James's teachers testified that she thought James's walking to school was "a good idea" that would help him "learn his lesson" about acting appropriately on the school bus.
The father also took exception to the mother's and Bishop's paddling James when he misbehaved. The mother testified that if James acted in a manner which, in her opinion, warranted his being paddled, she would follow a certain routine. First, James would be sent to his room, and the mother would spend approximately 15 minutes thinking about whether he deserved to be paddled; the mother asserted that she took that time to ensure that she was not acting out of anger. The mother would then enter James's room and tell him what he had done wrong and why he was being paddled. James would then receive three strikes from the paddle and he would be made to stay in his room for another 15-minute period to think about what he had done wrong.
James corroborated the mother's description of the routine she employed when paddling him. James stated that he sometimes received extra strikes for "moving" or for putting his hands behind his backside. He described the paddle as being wooden; the trial court characterized it as resembling a "fraternity paddle." The evidence suggests that the same routine was followed by Bishop when he paddled James. According to James, he was paddled for things like not cleaning his room after being repeatedly told to do so, saying "yeah" instead of "yes sir" or "yes ma'am," being suspended from riding the school bus, or for making bad grades at school. James stated that he had not been paddled since the summer before the November 3, 2005, hearing. The mother testified that James had been paddled "less than 10 times" during his entire life; the father did not dispute that assertion. There was no evidence to suggest that the mother's paddling James caused him to suffer any physical injury or require any medical treatment.
The father testified that be would not paddle the children and that he had not done so since they were very young. The mother, however, testified that approximately two to three years before the hearing the children had returned from the father's house with strap marks across their legs. The mother attributed those marks to the father's spanking the children. *Page 165 
However, James testified that the father did not spank him.
On approximately three occasions, the mother cut James's hair as a form of punishment. The mother cut James's hair when James was suspended from riding the bus and when he "back talked" one of his teachers. The mother also cut James's hair when he wrote a sexually explicit letter to one of his female classmates. According to James, the mother did not paddle him for writing the vulgar letter because he had been paddled at school for that offense.
To punish James by cutting his hair, the mother would give him a "buzz cut" with a "number two clipper." Though he thought that his hair grew back "pretty fast," James testified that he was "kind of embarrassed" when he arrived at school the day after his mother cut his hair for punishment. James stated, however, that his mother also cut his hair when he simply needed a haircut; for example, he testified that he had requested that the mother cut his hair for a school dance.
The father did not think that cutting James's hair was an appropriate form of punishment. He described the mother's doing so as "shaving" James's head. The mother disagreed with the father's characterization of the haircut. The mother also entered into evidence photographs of James. One of the photographs was taken approximately one week after the mother had cut James's hair for punishment, and other photographs show James wearing his "normal" hair style; the hair styles do not appear to be drastically different. James's teacher testified that she believed that the mother's cutting James's hair for punishment was appropriate.
The father also took exception to the mother's excluding James from participating in a family event. The mother testified that, on that one occasion, she thought James did not want to participate with her family and she decided that he could not accompany the mother, Bishop, and Colton to a restaurant. James testified that the mother made the decision because he had given the mother "a dirty look." After the trio returned from the restaurant, James approached the mother and asked to participate with the family once again, a request that the mother granted. There was no evidence indicating that James went unfed as a result of not going to the restaurant on that occasion.
The father testified that he did not believe that the mother's choices for discipline of James, described above, were appropriate. He stated that he believed that the only appropriate form of discipline should be the "taking away of privileges" rather than the methods employed by the mother. Despite his apparent concern for the children's safety, the father had never asked the mother to change her methods of discipline. Moreover, the father was not requesting that Colton's custody be modified despite James's claim that Colton was paddled more often than James.
The father admitted that most, if not all, of his information regarding the mother's disciplining of the children and James's school-related problems came from James. The father testified that he had not requested to see James's report cards, had never attended a parent-teacher conference, and had never spoken with any of James's teachers regarding any discipline problems at school involving James. The mother's attorney called into question the completeness of the information provided to the father by James by showing him a copy of the sexually explicit letter that James had written to his female classmate; the father admitted that James's description of the letter was "not as bad" as the actual letter. Throughout his testimony, the father stated that he deferred to the *Page 166 
wishes of the children as to where they should live and whether they should be separated.
The mother testified that she was concerned about the choices the father made with regard to the children. The father admitted that he allowed the children to watch "R rated" movies, and he further admitted that he provided James, who was 14 years old at the time, two shirts with profane language promoting the consumption of alcohol.
It is well settled that our standard of review in cases in which the trial court considers ore tenus evidence is limited because of the presumption of correctness afforded the trial court's judgment. Judah v. Gilmore 804 So.2d 1092, 1094
(Ala.Civ.App. 2000) (citing Ex parte Murphy,670 So.2d 51, 52 (Ala. 1995)). However, when the trial court's judgment is so unsupported by the evidence as to be plainly and palpably wrong, this court must reverse the judgment. Id. Also, "when this court is presented with an issue of law, such as the application of the correct child-custody-modification standard, we review the judgment of the trial court de novo, without affording it any presumption of correctness. Ex partePerkins, 646 So.2d 46 (Ala. 1994)." Barber v.Moore, 897 So.2d 1150, 1153 (Ala.Civ.App. 2004).
 "[W]here the parents have joint legal custody, but a previous judicial determination grants primary custody to one parent and secondary custody to the other, `the trial court [is] correct in applying the [Ex parte McLendon, 455 So.2d 863 (Ala. 1984)] standard and requiring the [parent] to show that a change in custody would materially promote the welfare and best interests of the child, offsetting the disruptive effect of uprooting the child.' Blackmon v. Scott, 622 So.2d 393, 394 (Ala.Civ.App. 1993)."
Scholl v. Parsons, 655 So.2d 1060, 1062
(Ala.Civ.App. 1995). "[T]he preference of the child, regardless of h[is] age and maturity, is not determinative of the issue of custody but is merely a factor the trial court may consider in reaching its decision. Ezell v. Hammond, 447 So.2d 766
(Ala.Civ.App. 1984)." Glover v. Singleton,598 So.2d 995, 996 (Ala.Civ.App. 1992). In Alabama, the separation of siblings is disfavored, absent a showing of compelling reasons for such a separation. See, e.g., Mardis v. Mardis,660 So.2d 597, 599 (Ala.Civ.App. 1995) (citing Jensen v.Short, 494 So.2d 90 (Ala.Civ.App. 1986); Gandy v.Gandy, 370 So.2d 1016 (Ala.Civ.App. 1979); and Pettis v.Pettis, 334 So.2d 913 (Ala.Civ.App. 1976)).
It is undisputed that the trial court was bound to apply the standard set forth in Ex parte McLendon, 455 So.2d 863
(Ala. 1984). As such, before the trial court could modify James's custody, it had to conclude, based on the evidence presented, that the modification would materially promote his welfare and best interest so as to offset the inherent disruption that would be caused by his leaving the mother's house, moving into the father's house, being separated from Colton, and changing schools. See Scholl v. Parsons, supra.
The mother argues on appeal that the trial court exceeded its discretion by modifying custody of James. We agree.
The trial court heard undisputed testimony that the father injured James when he was young, attempted to conceal Colton's broken arm, and abused the mother during their marriage. The trial court also heard undisputed testimony that the father had never been involved with James's school work and had never performed any parental duties such as taking James to the doctor or helping him with his homework. The father admitted that *Page 167 
he did not know the names of James's teachers or doctors and that he had never been to a parent-teacher conference or requested to see James's report card. The father testified that he sometimes missed visitation with the children and that he did not call or visit James on his birthday or give him a birthday present. The trial court also heard undisputed testimony that the father had failed to maintain life insurance for the benefit of the children and that he was sometimes late with his child-support payments.
Despite the evidence regarding the father, the trial court appears to have based its decision to modify James's custody solely on its findings regarding the mother's disciplining of James. We readily acknowledge that the trial court was in the best position to evaluate the credibility of the witnesses.See Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ.App. 2003) (noting that the trial court is in the unique position to directly observe the witnesses and to assess their demeanor and credibility). Although it was certainly within the province of the trial court to determine the credibility of the witnesses and to shape its judgment accordingly, that judgment must be supported by the evidence. See Judah v. Gilmore, supra.
Other than the father's opining that "I feel [James] is being abused," no witness testified that James had suffered any physical abuse at the hands of the mother. Neither James, the father, the mother, nor James's teacher testified in a manner to suggest that James had ever been physically harmed by the mother. However, the trial court concluded that the mother's paddling James was "physically . . . damaging [to him]."
James testified outside of the hearing of the mother and the father, and the trial court questioned him extensively; he spent considerable time describing the mother's paddling him. At no time did he testify to suffering pain or being injured. The trial court found that James received "repeated and severe whippings." The only evidence relating to the frequency of the paddlings came from the mother's testimony that James had received "less than 10" paddlings during his entire life. The trial court heard no testimony relating to the severity or degree of the paddlings James received.
The only evidence relating to the mother's or Bishop's state of mind at the time they administered a paddling was the testimony that they took several minutes to think about whether James deserved, in their minds, to be paddled and to ensure that they were not acting out of anger. The father offered no evidence to suggest otherwise, and James's description of the paddlings corroborated the mother's version of the routine that she and Bishop employed. Though the trial court found that routine to be a "terrifying sequence of events," there was no evidence indicating that James was frightened by any aspect of that disciplinary routine.
The trial court also heard testimony from James that the mother did not paddle him every time he did something wrong. James stated that the mother did not paddle him after he wrote the sexually explicit letter to his female classmate because he had been paddled at his school for the offense. The trial court's conclusion that James was suffering from physical abuse at the hands of the mother was unsupported by the evidence.
Likewise, the trial court found that James was suffering emotional harm because of the mother's disciplinary style. The trial court found that James suffered "humiliation" as a result of the mother's cutting his hair for punishment. The only testimony regarding the emotional toll exacted *Page 168 
by the mother's discipline on James was James's statement that he was "kind of embarrassed" after his mother cut his hair.
James also testified that he sometimes asked his mother to cut his hair. James stated that he "wanted to look really neat" for an upcoming school dance so he had asked his mother to cut his hair. A photograph entered into evidence taken at that dance and another photograph taken approximately one week after his mother cut his hair for punishment reflect that his hair style was substantially similar at each time. The trial court's conclusion that James was suffering emotional harm as a result of the mother's disciplining him by cutting his hair was not supported by the evidence.
Also, in concluding that James was suffering emotional abuse in the mother's home, the trial court noted that James "testified that he was terrified of [Bishop]." The record is simply devoid of any evidence to support that finding. Only the trial court questioned James about his feelings toward Bishop. That conversation was as follows:
 "TRIAL COURT: Would it be fair to say that you're afraid of Randall Bishop?
 "JAMES: I'm not really afraid of him.
 "TRIAL COURT: Just sometimes?
 "JAMES: Sometimes. Yes, ma'am."
Though the mother stated that the relationship between James and Bishop was satisfactory, James implied that he did not like Bishop. At no point, however, did James describe being terrified of Bishop. The trial court's conclusion that James was "terrified" of Bishop was not supported by the evidence.
James testified about his social life, and that testimony suggested that he is nothing but a well-adjusted, socially involved young man. The mother testified that, in her opinion, James was "friends with everybody in the whole school." Further, James's teacher described him as being a "very polite" and likeable student.
Again, we note that the trial court was free to gauge the credibility of the witnesses and the evidence they presented and to shape its judgment accordingly. See Ex parte Murphy, supra; Judah v. Gilmore, supra. Although some of the members of this court may not agree with all of the mother's disciplinary methods, the evidence simply does not support the trial court's ultimate conclusion that the mother's disciplining of James was "reprehensible and sadistic." The evidence in the record, taken together with the evidence regarding the father, does not support the factual findings on which the trial court based its judgment; therefore, that judgment is due to be reversed.
REVERSED AND REMANDED.
PITTMAN and BRYAN, JJ., concur.
CRAWLEY, P.J., concurs specially, with writing.
MURDOCK, J., concurs in the result, without writing.