On Application for Rehearing

THOMAS, Judge.
The opinion issued by this court on June 5, 2009, is withdrawn, and the following opinion is substituted therefor.
A.M. (“the mother”) appeals from a judgment of the Elmore Circuit Court awarding custody of B.N.S. (“the child”) to J.S. (“the father”). We reverse.
The child, a daughter, was born to the parents in 1999. The parents have never been married to each other. In 2001, the Elmore Juvenile Court awarded the parties joint legal custody and the mother sole physical custody of the child. In 2007, the father filed a petition to modify the 2001 judgment, seeking sole physical custody of the child. Following a hearing, the juvenile court denied the father’s petition and maintained sole physical custody of the child with the mother.
The father appealed to the Elmore Circuit Court for a trial de novo. The circuit court conducted ore tenus proceedings and, on September 11, 2008, entered the following judgment:
“This cause coming on before this Court as an appeal case from the Juvenile Court of Elmore County, Alabama and the parties presenting themselves before this Court upon the Petition to Modify Custody as filed by the father, ... and the parties presenting with counsel of record and Guardian ad Li-tem presenting for the minor child, this Court taking testimony at length, ore tenus, with record on July 2, 2008 and September 3, 2008, this Court does find as follows:
“1. That [the mother] and [the father] are the legal and biological parents of [the child], and the minor’s *959 custody is placed jointly by Order of [the Elmore Juvenile Court] dated April 9, 2001.
“2. That [the mother] has maintained the primary residence for said minor daughter during her life.
“3. That [the mother] testified, without objection, of misrepresentation to Elmore County Department of Human Resources for the purpose of obtaining food stamps at a time when she would not otherwise qualify for the same.
“4. That the parties’ child has Dyslexia and [attention-deficit disorder] and they have obtained treatment for the same.
“5. That [the mother’s] maternal aunt, ... who has been a stable foundation for [the mother] during her life, has maintained a strong interest in the welfare of [the child].
“6. That the parties’ representatives have presented the Court with more than ample information in order for this Court to make its finding of fact. “7. That the best interest of this child is served with her primary residence to be placed with her father, subject to the mother having visitation, at times when her husband, [T.M.,] is not present.
“8. That the mother is granted the same visitation schedule as the father used while the child was in the mother’s primary residence.
“9. That the father shall maintain the minor child in special treatment for Dyslexia for as long as the same is necessary, pending further Order of this Court.
“10. Child support is set at $196.00 per month, to be paid by the mother to the father, the same being in compliance with Rule 32, [Ala. R. Jud. Admin.,] and the same is suspended, pending further Orders of this Court.”
On September 16, 2008, the mother filed a notice of appeal to this court and a motion to stay execution of the judgment pending appellate review. Also on September 16, 2008, the father filed a post-judgment motion, requesting that the circuit court amend its judgment to reflect that the court had applied the standard enunciated in Ex parte McLendon, 455 So.2d 863 (Ala.1984) — rather than the best-interest standard — to the evidence presented and to reflect that the court had concluded that the father had met his burden under McLendon. On the same day, the father filed an objection to the mother’s motion to stay execution of the judgment.
On September 19, 2008, the circuit court entered an order denying the mother’s request to stay execution of the judgment. On September 30, 2008, the father filed a motion to clarify the visitation provisions in the judgment, specifically requesting that the court designate the location at which visitation exchanges should take place. The circuit court never ruled on that motion. On October 9, 2008, the circuit court made and initialed the following entry on the case-action-summary sheet: “Upon motion to amend, granted in that McLendon standard applied to ruling.” On October 10, 2008, the father filed a “Notice of Compliance,” contending that he had complied with paragraph nine of the judgment requiring him to “maintain the minor child in special treatment for Dyslexia for as long as the same is necessary.” The same day, the mother filed an emergency motion alleging that the father had failed to comply with paragraph nine of the judgment and requesting that the court enforce its judgment regarding the child’s dyslexia treatment. The circuit court never ruled on that motion.

*960
Finality of the Judgment

Although neither party has raised an issue concerning this court’s jurisdiction to entertain the mother’s appeal, we first consider whether this court has jurisdiction over the appeal, because “‘jurisdictional matters are of such magnitude that we take notice of them at any time and do so even ex mero motu.’” Wallace v. Tee Jays Mfg. Co., 689 So.2d 210, 211 (Ala.Civ.App.1997) (quoting Nunn v. Baker, 518 So.2d 711, 712 (Ala.1987)). An appeal ordinarily lies only from a final judgment. See § 12-22-2, Ala.Code 1975; Bean v. Craig, 557 So.2d 1249, 1253 (Ala.1990). An order is generally not final unless it disposes of all claims or the rights or liabilities of all parties. Ex parte Harris, 506 So.2d 1003, 1004 (Ala.Civ.App.1987).
Pursuant to Rule 1(B), Ala. R. Juv. P.,[1] the father’s September 16, 2008, post-judgment motion was denied by operation of law on September 30, 2008, 14 days after it was filed, because the circuit court had not ruled on it. When the circuit court purported to rule on the father’s motion by making and initialing an entry on the case-action-summary sheet on October 9, 2008, that action was a nullity. See Ex parte Hornsby, 663 So.2d 966 (Ala.1995). To the extent that the father’s September 30, 2008, “Motion to Clarify” can be characterized as a postjudgment motion, it was untimely because it was not filed within 14 days of the entry of the circuit court’s September 11, 2008, order, see Rule 1(B), Ala. R. Juv. P., and, therefore, the circuit court had no jurisdiction to act on it, see Pitts v. Means, 571 So.2d 1138, 1139 (Ala.Civ.App.1990).
The mother’s notice of appeal to this court, which had been held in abeyance pending the disposition of the father’s September 16, 2008, postjudgment motion, see Rule 4(a)(5), Ala. R.App. P.,[2] “quickened” on September 30, 2008, the date the judgment became final, see J.L.W. v. E.O.J., 992 So.2d 727 (Ala.Civ.App.2008). The mother’s October 10, 2008, emergency motion alleging that the father had failed to comply with paragraph nine of the judgment and requesting that the court enforce its judgment regarding the child’s dyslexia treatment is akin to a contempt motion alleging that the father had violated the circuit court’s previously entered custody-modification order. The mother’s filing of that motion initiated a proceeding separate and independent from the action in which the custody-modification order had been entered and does not affect the finality of the custody-modification order. See Decker v. Decker, 984 So.2d 1216, 1220 (Ala.Civ.App.2007)(distinguishing Wilcoxen v. Wilcoxen, 907 So.2d 447 (Ala.Civ.App.2005), from Heaston v. Nabors, 889 So.2d 588 (Ala.Civ.App.2004)). This appeal is, therefore, taken from a final judgment.
On appeal, the mother argues that the circuit court’s judgment was unsupported *961 by the evidence because the evidence was not sufficient to meet the standard enunciated in Ex parte McLendon for a modification of custody. Notwithstanding the fact that the circuit court’s October 9, 2008, notation on the case-action-summary sheet — indicating that it had applied the McLendon standard to the facts before it — was a nullity, neither party argues that the circuit court failed to use the proper standard; both parties assume that the court applied the McLendon standard; Therefore, we will review the evidence to determine whether it supports the judgment awarding custody to the father.

Factual Background

The child has lived with the mother since birth. In 2001, the father was awarded liberal visitation with the child, including visitation on alternate weekends, mid-week visitation on Wednesdays, and visitation during five weeks in the summer. The father acknowledged that, between 2001 and 2006, he had not exercised his summer visitation with the child. The father explained that, until he married M.S. (“the stepmother”) in 2006, he did not have a place for the child because he had lived with a roommate. He stated that his parents had exercised his summer visitation during the years before he married the stepmother. The father married the stepmother when she became pregnant by him. In addition to the child that the father and the stepmother have together, the stepmother also has a daughter from a previous relationship who is approximately the same age as the parties’ child.
The mother married T.M. in 2004. The mother testified that T.M. had used illegal drugs and had sold drugs to pay for his motorcycle. The record indicates that T.M. had tested positive for marijuana following a hearing in the juvenile court. At the time of the circuit court trial, the mother and T.M. were separated and the mother had filed for a divorce from T.M.
The child has learning disabilities, as well as vision problems and hearing difficulties. She wears eyeglasses and has hearing aids in both ears. She has been diagnosed with dyslexia and attention-deficit disorder. Until the fall of 2008, the child had been enrolled in the Tallassee public-school system. After her first year in school, the child’s teacher recommended that she repeat kindergarten. The mother followed that recommendation, a course of action to which, the mother said, the father and the child’s paternal grandparents had been opposed because they thought the child should have been promoted to first grade. When the child repeated kindergarten, the mother requested that the school perform testing on the child. The mother was told that the school did not do testing, so she took the child to Auburn University for testing, which proved to be inconclusive for dyslexia. Two years later, the mother had the child tested by the Alabama Scottish Rite Foundation, and that assessment indicated that the child had dyslexia. The Tallassee elementary school attempted to compensate for the child’s learning disabilities by reading tests to her, by allowing her more time to complete tasks, by giving her less homework, and by providing her with after-school tutoring with a Mrs. Hornsby. The father paid for the child’s tutoring with Hornsby. Despite the school’s attempt to accommodate the child’s disabilities and to provide tutoring by Hornsby, the child continued to fall behind in school. At the time of trial, the child was in the third grade but she was reading on a late-kindergarten/early-first-grade level.
The mother testified that she had had dyslexia as a child, and she did not think that the education she had received from the Tallassee public-school system had *962 been adequate. She stated that she and the child’s maternal great-aunt had arranged to have the child tested for vision and hearing problems as well as learning disabilities; she said that one of them had attended all the Individualized Education Program (“I.E.P.”) meetings at the child’s school to plan and monitor the child’s educational progress. The mother stated that she had informed the father of the dates for all the child’s tests, doctor appointments, and I.E.P. meetings but that the father had appeared for very few of those appointments. The father acknowledged that he had not been present for many of the child’s medical and educational assessments, but he explained that the mother had not always given him adequate notice of the tests, appointments, and meetings concerning the child. The father testified that he thought the child had only a slight hearing loss, and, he said, her problems were not paying attention and not trying hard enough. The mother testified that the stepmother had a habit of intruding into the child’s activities. The mother stated that the stepmother and her daughter, the child’s stepsister, came to some of the after-school tutoring sessions the child had with Hornsby. The mother stated that she did not consider their presence beneficial to the child. The mother also testified that the stepmother had visited the child at school on numerous occasions to bring the child a change of clothes or to change her hairdo. In addition, the mother said that the stepmother had attended the child’s Girl Scout meetings and Vacation Bible School sessions and had even approached the mother’s older daughter, the child’s half sister, to make a negative comment about the mother.
Jennifer Holt, the child’s second-grade teacher, testified that sometimes the child’s hair was not “fixed” and her clothes were “a little worn out.” Holt stated that the stepmother had come to the school three times to change the child’s clothes or hairdo and that the child had been pleased and excited to have the stepmother visit her at school. Holt said she doubted that the child’s academic problems were caused by dyslexia. Instead, she attributed the child’s inability to read to what, she said, was the mother’s failure to spend quality time reading with the child at home. Holt testified that she had spent extensive one-on-one time with the child, but, she said, the school had developed no specific intervention to deal with dyslexia.
In March 2007, the child began seeing Sandra Segall, a counselor, in order to address the child’s low self-esteem and incessant lying. Segall testified that the child told different stories, depending upon whom she was talking to and who had influenced her. Segall said the child had told her that the mother spent no time with her, did not help her, and did not have enough food in the house. Segall said those things were not true. She opined that the mother and the child had a good relationship but that the stepmother had coached the child to make negative statements about the mother. Segall did not think the stepmother was a positive influence on the child. She said she thought the father and the stepmother were more interested in “bashing the mother” than in helping the child.
Segall testified that she had been trained in dyslexia testing at Boston University, that she herself has a child with dyslexia, and that she is convinced that the child in this case has dyslexia. Segall recommended that the mother seek tutoring for the child at Churchill Academy in Montgomery, a private school that specializes in helping children with dyslexia and other learning disabilities. Beginning in the fall of 2007, the mother arranged for the child to be tutored by a Mrs. Brown three days a week after school at Churchill *963 Academy. Segall stated that the child was not receiving emotional support in the father’s home for her dyslexia. Segall said that the child was scheduled to be tutored at Churchill Academy on Tuesdays, Wednesdays, and Thursdays but that the father, who has visitation on Wednesdays, did not take the child to her tutoring sessions on that day. The mother testified that the father was opposed to the child’s being tutored at Churchill Academy and continued to take her to Hornsby for tutoring in Tallassee. The mother wrote the father a letter requesting that he come to talk with Brown, the child’s tutor at Churchill Academy, on April 8, 2008, at 3:15 p.m., so that he could understand “everything [that was] going on,” but the father neither replied to the letter nor came to the meeting.
Segall opined that the Tallassee public-school system was compensating for, but not remediating, the child’s learning disabilities. She explained that compensating for a learning disability is “working around it,” while remediating a learning disability is “fixing” it. She further explained that remediation for dyslexia usually requires an intensive two-year effort, but she said that if remediation is not undertaken by the age of 11, it is too late. Segall stated that the “remediation window” for the child was rapidly closing and that, if she did not receive help soon, the child would never be able to overcome her reading difficulties.
Lisa Schroeder, the director of Churchill Academy, testified that dyslexia is a language-processing disorder that is not caused by a lack of quality time with a parent at home. Schroeder stated that, although the child had made a four- to five-month gain on reading proficiency as a result of being tutored at her facility, the child needed something more intensive than tutoring because she is so academically delayed. The mother testified that, because the child had made progress in reading as a consequence of being tutored at Churchill Academy, she had considered enrolling the child as a student at Churchill Academy for the 2007-2008 school year. She said that she had written the father several letters seeking to discuss the issue but that the father had merely stated his opposition to the child’s leaving the Tallas-see school system and had refused to discuss the matter. The mother testified that the tuition at Churchill Academy is $636.36 per month. She stated that she had applied for and had received Supplemental Security Income (“SSI”) benefits for the child in the amount of $428.58 per month.
Jennifer Holt stated that she did not think Churchill Academy had helped the child. In fact, she said, the child had been embarrassed to check out of school early to attend tutoring sessions at Churchill Academy three days a week. The father’s mother testified that she had not heard good things about Churchill Academy; she said she thought the Tallassee public-school system could “deal with” the child. On cross-examination, she acknowledged that the father had had dyslexia as a child and had been home-schooled for three years when he was in the elementary grades.
The father testified that the mother’s home was unclean, that the carpets had to be removed because they were stained by pet urine and feces, and that the child had contracted head lice in the mother’s home. The mother testified that the child had developed head lice after visitation in the father’s home. She presented photographic evidence showing her residence as clean and well furnished and depicting the child as well dressed and appropriately groomed.
Teresa Minnifield, a Department of Human Resources (“DHR”) food-assistance *964 supervisor who determines food-stamp eligibility, testified that the mother had signed an application for food stamps in 2005 and 2006. The mother had sworn under penalty of perjury that she was single and that there were only two children in the household. Minnifield testified that, when she verified an anonymous tip that the mother was married and there were three children in the household, she referred the matter to the DHR claims unit for a fraud investigation. At trial, the mother admitted that her application had misrepresented her marital status and the number of children living with her.

Standard of Review

In Ex parte McLendon, supra, the Alabama Supreme Court held that a parent seeking a change of custody must prove not only that he or she is a fit parent, but also that a change in custody “ ‘will materially promote [the] child’s welfare,”’ 455 So.2d at 866 (quoting Greene v. Greene, 249 Ala. 155, 157, 30 So.2d 444, 445 (1947)). The court explained that the material-promotion standard is
“ ‘a rule of repose, allowing the child, whose welfare is paramount, the valuable benefit of stability and the right to put down into its environment those roots necessary for the child’s healthy growth into adolescence and adulthood. The doctrine requires that the party seeking modification prove to the court’s satisfaction that material changes affecting the child’s welfare since the most recent decree demonstrate that custody should be disturbed to promote the child’s best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.’ ”
455 So.2d at 865-66 (quoting Wood v. Wood, 333 So.2d 826, 828 (Ala.Civ.App.1976)).
This court’s standard of review in custody matters when the evidence is presented ore tenus is limited. Alexander v. Alexander, 625 So.2d 433, 434 (Ala.Civ.App.1993).
“Modification of child custody is a matter which falls within the discretion of the trial court. Hester v. Hester, 460 So.2d 1305 (Ala.Civ.App.1984). A trial court is afforded great discretion when determining matters of child custody. Its judgment is presumed correct and will not be disturbed on appeal absent an abuse of discretion or where it is shown to be plainly and palpably wrong. Benton v. Benton, 520 So.2d 534 (Ala.Civ.App.1988).”
Id. See also Ex parte Cleghorn, 993 So.2d 462, 465 (Ala.2008). The trial court’s opportunity to observe witness demeanor is especially important in child-custody cases, see Ex parte Fann, 810 So.2d 631, 636 (Ala.2001). “However, even under the ore tenus rule, ‘[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed.’ ” B.J.N. v. P.D., 742 So.2d 1270, 1274 (Ala.Civ.App.1999) (quoting Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979)).

Analysis

The circuit court’s judgment contains five numbered paragraphs that recount the facts of the case. All five paragraphs, however, recite evidence that was undisputed, namely: (1) that the mother and the father are the biological parents of the child; (2) that the child has always resided with the mother; (3) that the mother admitted to misrepresenting her *965 eligibility for food stamps to the Elmore County DHR; (4) that the child has dyslexia and attention-deficit disorder and has received treatment for those conditions; and (5) that the mother’s aunt has been a stable foundation for the mother and maintains a strong interest in the child’s welfare. The judgment does not include any witness-credibility determinations, nor does it specifically resolve any disputed questions of fact.
“ ‘It is ... well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ ” Ex parte Roberts, 796 So.2d 349, 352 (Ala.2001) (quoting Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996)). Notwithstanding the deference due the circuit court’s judgment under the ore tenus rule, we agree with the mother that the father failed to meet the burden imposed by McLendon and that the circuit court’s judgment is plainly and palpably wrong. The evidence in the record does not support the conclusion that a change of custody would materially promote the child’s best interests and welfare and that the “‘positive good brought about by the modification [would] more than offset the inherently disruptive effect caused by uprooting the child.’ ” McLendon, 455 So.2d at 865.
The circuit court heard undisputed testimony demonstrating that the mother— without support from the father, and often in the face of antagonism by the father— had arranged for medical and educational testing for the child; that the mother had followed the recommendations of those she considered more knowledgeable than she was; and that the mother, in an effort to cover a part of the child’s tuition at a private school specializing in learning disabilities, had applied for SSI benefits for the child in an attempt to address the child’s academic problems. The court also heard undisputed testimony demonstrating that the father, the stepmother, and the child’s paternal grandparents had either denied the existence or minimized the impact of the child’s learning disabilities, specifically her dyslexia, and had attributed her academic deficiencies to the child’s failure to pay attention and try harder or to what, they thought, was poor parenting by the mother.
As this court stated in Bishop v. Knight, 949 So.2d 160,167 (Ala.Civ.App.2006):
“We readily acknowledge that the trial court was in the best position to evaluate the credibility of the witnesses. See Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ.App.2003) (noting that the trial court is in the unique position to directly observe the witnesses and to assess their demeanor and credibility). Although it was certainly within the province of the trial court to determine the credibility of the witnesses and to shape its judgment accordingly, that judgment must be supported by the evidence. See Judah v. Gilmore, [804 So.2d 1092 (Ala.Civ.App.2000) ].”
This court cannot and will not undertake to resolve the question of what school the child should attend or what educational program the child should follow in order to remediate her learning disabilities. Nor do we condone the mother’s admitted misrepresentation of the facts concerning her eligibility for food stamps. However, we cannot affirm a trial court’s custody-modification judgment that is not supported by sufficient evidence to conclude that a change in custody will materially promote the child’s best interests and that the positive good brought about by a change in custody will more than offset the inherently disruptive effect caused by uprooting the child.
*966 The judgment of the Elmore Circuit Court is reversed.
APPLICATION OVERRULED; OPINION OF JUNE 5, 2009, WITHDRAWN; OPINION SUBSTITUTED; REVERSED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.

. Rule 1(B) provides, in pertinent part:
"Procedure shall be uniform in all juvenile courts, whether at the circuit of district court level or in the circuit court by trial de novo. All postjudgment motions, whether provided for by the Alabama Rules of Civil Procedure or the Alabama Rules of Criminal Procedure, must be filed within 14 days after entry of order or judgment and shall not remain pending for more than 14 days. A postjudgment motion is deemed denied if not ruled on within 14 days of filing.”

. Rule 4(a)(5) provides:
"A notice of appeal filed after the entry of the judgment but before the disposition of all post-judgment motions filed pursuant to Rules 50, 52, 55, and 59, Alabama Rules of Civil Procedure, shall be held in abeyance until all post-judgment motions filed pursuant to Rules 50, 52, 55, and 59 are ruled upon; such a notice of appeal shall become effective upon the disposition of the last of all such motions.”