MOORE, Judge.
Richard Long (“the husband”) appeals from a judgment of the Baldwin Circuit Court (“the trial court”) divorcing him from Karen Long (“the wife”), dividing the parties’ marital property, awarding sole custody of the parties’ remaining minor child to the wife, and ordering the husband to pay child support and periodic alimony. We affirm in part and reverse in part.

Procedural Background

On March 24, 2011, after a 26-year marriage and the birth of 2 children, the husband filed a complaint for a divorce from the wife; he alleged that the parties had become incompatible. The wife filed a counterclaim for a divorce alleging that the husband had committed adultery and that the parties had become incompatible. She sought sole custody of the parties’ two children; child support; postminority support for J.L., the parties’ oldest child; and periodic alimony. The wife also moved for an award of pendente lite support pending the entry of a final judgment.
On September 13, 2011, the trial court commenced an ore tenus hearing on the parties’ competing claims for a divorce. On September 22, 2011, the trial court ordered the husband to pay $2,700 per month in pendente lite child support pending the entry of a final judgment. The trial court also recognized that the marital home had gone into foreclosure and that, as a result, the wife and the children would have to vacate the marital home in a few days; the trial court allowed the wife to sell the contents of the marital home, to make an accounting of the proceeds, to utilize one-half of the proceeds, and to pay into court the remaining proceeds.
On October 3, 2011, the trial court completed the ore tenus hearing on the parties’ competing claims for a divorce, and on October 25, 2011, the trial court entered its final judgment. In that judgment, the trial court, among other things, divorced the parties, awarded the wife sole legal and physical custody of the parties’ minor child, B.L.;[1] ordered that the husband was entitled to visit with B.L. a minimum of three occasions per month, with the times and duration of those visits to be set by mutual agreement of the parties; ordered the husband to pay $438 as child support each month; ordered the parties to equally share in the postminority educational expenses for J.L., subject to certain specified limitations; specified that the husband owed a child-support arrear-age of $1,314 for the months of June, July, and August 2011 and a child-support ar-rearage of $2,200 for the month of September 2011, and specified that, after applying one-half of the proceeds received from the sale of the household contents to the hus *639 band’s total arrearage, the husband’s remaining child-support arrearage was $915.87;[2] ordered the husband to pay $1,000 per month as periodic alimony to the wife; allowed the wife to sell various items belonging to the husband that were being held in storage, with the first $916 received from that sale to be applied to the husband’s child-support arrearage and the remainder of the proceeds to be awarded to the wife as a property award; ordered the parties to sell a parcel of property held jointly in their names, with the proceeds to be distributed equally between them; ordered the parties to split certain specified credit-card debts equally between them, but ordered that any other debts not specifically addressed were the responsibility of the individual or individuals in whose name those accounts then existed; and awarded the parties various automobiles and motorized vehicles and any debts associated with those vehicles.
On November 3, 2011, the husband moved the trial court for a new trial or to alter, amend, or vacate the judgment, pursuant to Rule 59, Ala. R. Civ. P. On that same date, the husband moved the trial court to stay enforcement of the October 25, 2011, judgment and to set a reasonable supersedeas bond. Additionally, on November 3, 2011, the husband filed a motion for relief from the judgment, pursuant to Rule 60, Ala. R. Civ. P., asserting that the wife had testified untruthfully regarding certain facts during the ore tenus hearing. On January 12, 2012, after a hearing, the trial court denied the husband’s motion for a new trial or to alter, amend, or vacate the judgment and his motion for relief from the judgment. The trial court, however, granted the husband’s motion for a stay of the judgment, conditioned upon his posting a bond in the amount of $13,000 with the trial-court clerk; the trial court specified that the bond amount was to secure his periodic-alimony obligation for 13 months but was not intended to address his child-support obligation, which, the trial court stated, the husband was to continue to pay during the pendency of his appeal.[3] The husband timely appealed.

Evidentiary Background

The wife testified that she and the husband had married in 1985 and that the marriage had produced two sons: J.L., who, at the time of the final hearing, was 19 years old, and B.L., who, at the time of the final hearing, was 17 years old. At the time of the final hearing, B.L. continued living with the wife in the marital home, while J.L. had moved to Auburn to attend college. The wife testified that she and J.L. had obtained student loans to pay his college tuition and expenses. According to the wife, the husband had given J.L. $1,300 toward his college expenses.
The wife testified that she had been seriously ill in 2010. The wife also testified that the husband and his paramour, *640 Laurie Kittrell, had been discovered kissing on the beach in October 2010. The wife testified that she underwent abdominal surgery in December 2010 to remove 12 inches of her intestines and that, in January 2011, the parties’ oldest son had left for college. The wife testified that, two days later, the husband had confessed to her that he “was in adultery” and that he had moved out of the marital home.
The wife also testified that she had found a letter dated February 2011 and written by the husband to Kittrell; in that letter, which the wife introduced into evidence, the husband professed his 10-year love for Kittrell. The wife admitted that she had no concrete evidence to establish that the husband had engaged in sexual intercourse with Kittrell or anyone else, and she acknowledged that the husband suffered from erectile dysfunction.
The wife testified that she was employed as an administrator at Calvary Christian Learning Center and that, since the parties’ separation in January 2011, she also had been working two part-time jobs to help with the expenses of the marital home and the children. She was working at “Bath Junkie” earning $8.50 per hour or approximately $45 per week. She also was working at ‘Tacky’s All Services” earning $9 per hour or approximately $50 per week. The wife acknowledged that the CS-41 child-support-obligation income-statement form, see Rule 32, Ala. R. Jud. Admin., she had submitted to the trial court did not accurately reflect her part-time employment income.
The wife introduced into evidence copies of her 2009 and 2010 W-2s from Calvary Christian Learning Center. Those documents indicated that the wife had earned $7,606.85 in 2009 and $28,663.16 in 2010. The wife testified that, at the time of the final hearing, her salary at Calvary Christian was $30,000 and that she expected to make a little more than that during 2011 because of her two part-time jobs. She testified that she was planning to vacate the marital home a few days after the final hearing to move into a rental house; she testified that the rental house would cost her $1,000 per month.
The wife testified that, during the marriage, the husband had been employed as the senior pastor of Christian Life Church in Orange Beach and that his total compensation package had been $87,600 per year. According to the wife, the husband had left the marital home in January 2011 and the church had asked him to resign around the same time. The wife believed that the church had given the husband a severance package of his full salary for six months when he resigned. According to the wife, after the husband’s resignation, she had received money from the church in only February, March, April, and May 2011. She testified that, before the husband’s resignation, the church had been paying him $2,700 per month as a housing allowance and an additional $1,019 every two weeks. The wife testified that, after the husband’s resignation, she had received less than she had expected and for a shorter period than she had expected.
The wife testified that the marital home had been lost to a foreclosure. The wife testified that the monthly mortgage payments on the marital home had been $2,700 and that she had not made those mortgage payments after January 2011. She estimated that the parties had owed $202,000 on the marital home and that the value of the marital home had been “around $237,000 or $250,000.” The wife testified that she had tried to sell the marital home but that she had had no success.
The wife acknowledged that the trial court had ordered the parties to maintain the status quo and to pay all recurring *641 monthly bills pending the entry of a final judgment; the wife testified that she had paid all the other recurring bills but that she had not paid the mortgage payments. According to the wife, she had discussed the mortgage payments with the husband, and, she said he had instructed her not to pay them. The wife also acknowledged that the trial court had ordered the parties not to dispose of marital assets. Although the wife admitted that she had readied the contents of the marital home to conduct an estate sale, she had not held that sale at the time of the final hearing. The wife testified that the contents of the marital home would not fit into her rental house and that she needed whatever money she could make from selling those items; she" requested permission to proceed with the planned estate sale.
The wife testified that the husband had sold 3 or 4 of the 50 to 70 guns that he had collected through the years, that some jewelry from the marital home was missing, and that she believed the husband had sold a boat that they had owned. Thus, the wife believed that the husband had violated the status quo order. The wife testified that she did not know how much the husband may have received for those items or how he had used the proceeds. She also asked the trial court to order the husband to sell the remaining guns and to order the proceeds to be used to pay off marital debts.
The wife testified that the husband was skilled as a jeweler and could earn a significant income in that business. She acknowledged that his adultery might impact his ability to work as a pastor again. She testified that, at the time of the final hearing, the husband was working as a manager at Layla’s Ice Cream Shop; the wife testified that the husband’s paramour, Laurie Kittrell, owns that business. The wife introduced into evidence a signed agreement between the husband and Kitt-rell; in that agreement, Kittrell agreed that the husband would earn $18 per hour, not exceeding 40 hours per week, as an independent contractor while managing her ice-cream shop.
The wife acknowledged that, in December 2010, she and the husband had purchased new vehicles for her and for J.L.; they had purchased a 2010 Hyundai Sonata for the wife and a 2010 Hyundai Elantra for J.L. The wife testified that they had cashed out one of the husband’s two life-insurance policies to pay for the vehicles. According to the wife, the husband drives a 2006 Chrysler automobile and an older model Chevrolet Tahoe. The youngest son B.L. drives a 1990 Mustang automobile. All the vehicles driven by the husband, the wife, and the children were owned debt-free. The wife testified that she had been paying the insurance for the children’s vehicles.
The wife testified that, since the parties’ separation, she had learned that the husband had cashed out his other life-insurance policy. The wife had not agreed for him to do so, and she denied having prior knowledge that the husband intended to do so. She believed he had received $6,500 from that policy.
The wife testified that she and the husband had had two joint credit-card debts. She introduced into evidence documents indicating that they had owed $32,000 on one account as of May 2011 and $14,243 on the other as of April 2011. The wife acknowledged that the husband is a member in a limited liability company (“LLC”), but, she testified, she was not claiming any interest in that LLC or its assets.
The wife testified that the church had stopped sending severance checks as of May 2011 and that the husband had not offered her any additional money to assist with the marital expenses. Although the *642 marital home had been for sale, the wife testified that she could not afford to make the monthly mortgage payments and the mortgagee had foreclosed on it before it sold. The wife discovered, however, that the husband had continued to make payments on his parents’ home even though he knew that the marital home was going into foreclosure. The wife introduced into evidence documents that, according to her, established the husband’s contributions toward his parents’ mortgage payments.
The wife also introduced into evidence documents that reflected the phrase “loan repay” multiple times on the husband’s employee account at the church in 2010. The wife testified that she had had no knowledge that the husband had borrowed money from the church or how he had used any money that he had borrowed. She denied any knowledge of the circumstances surrounding those entries on the husband’s employee-account statement.
The wife testified that she and the husband had had a joint checking account at Regions Bank at the time of their separation but that the bank had closed the account because the husband had written a large number of checks exceeding the balance of the account. The wife introduced into evidence a copy of the account statement indicating numerous overdraft fees and returned-check fees incurred in April and May 2011.
The wife testified that, since the parties’ separation, the youngest child had visited with the husband approximately once a week. According to the wife, the child typically had met the husband for dinner but that the child had chosen not to spend the night with the husband. The wife testified that the youngest child had suffered anxiety attacks since the husband had left the marital home. The husband’s former church had agreed to pay for counseling for one year for the child. The wife testified that, to her knowledge, the oldest child had not visited with the husband at all since the separation.
The wife admitted that the husband had provided financial assistance directly to the children since the separation. She also admitted that the husband had paid for the youngest child to attend two summer camps, that he had paid for the youngest child’s birthday trip, and that he had provided school clothes and supplies for the youngest child.
The wife requested sole custody of the minor child, child support, and periodic alimony. The wife did not know how much she would need in periodic alimony to meet all of her expenses, but she knew that her rent would cost $1,000 per month and, she testified, she wanted to be able to pay her rent.
The husband testified that he and the wife had had a difficult marriage and that they had been in and out of counseling for years. According to the husband, the wife had often discussed divorce and had stated to him in the past that she would divorce him if people would not blame her for the husband’s losing his job as a minister. The husband testified that the wife’s lack of participation in the church and in the ministry had been a problem and that, in 2009, the elders of the church had counseled the husband and the wife about it.
The husband admitted that he had kissed Kittrell in 2010. The husband acknowledged that someone had seen him kissing Kittrell on that day in 2010 and that the person had confronted the husband and given him a deadline by which to tell the wife and the church or the other person would do so. According to the husband, he then had confessed before the church congregation and had voluntarily resigned from his position as senior minister of the church. The husband testified *643 that the church had agreed to provide a six-month severance package to the husband and to provide health insurance through the end of 2011. The husband testified that all of his severance checks had gone directly to the wife.
The husband testified that, after the separation, he had accepted a job with Spectrum Beach Resorts and had rented a house for $850 per month. At the time of the final hearing, however, he was managing “a small restaurant” on the beach. According to the husband, he was earning $18 per hour in that position and his monthly income was $2,253.34. At the time of the final hearing, he was living rent-free in a condominium at Gulf Shores Beach Retreat, a Christian retreat center.
The husband denied that the incident involving Kittrell had prompted his resignation from the church, and he stated that he believed he could return to work as a minister but probably not as a senior minister of a church. He admitted that he had not inquired about returning to work as a minister for a church, but he also testified that he had located an opening for a bench jeweler in Birmingham. According to the husband, the jeweler position would have paid approximately $15 to $17 per hour, but it would require him to relocate to Birmingham, so he had not pursued it.
The husband testified that he had given the oldest child approximately $3,500 to $4,000 since he and the wife had separated. The husband estimated the value of the marital home to have been between $265,000 to $270,000 and, he testified, he and the wife had owed $200,000 on it. The husband testified that he had expected the wife to make the mortgage payments out of the severance checks that were sent to her from the church. Although the husband denied the wife’s testimony that he had directly incurred any of the credit-card debts, he admitted that certain items purchased using those accounts might have benefited him.
The husband reviewed a list of the items that the wife had placed in storage and that the wife had testified belonged to him. The husband denied that all of the property stored by the wife belonged to him. He also disputed the values that had been placed on many of the items that had been stored by the wife.
The husband denied that he was paying for or assisting his parents with their mortgage payments. He testified that his father is terminally ill and that, as a result, his parents had transferred the title to their home to the husband, that his parents would deposit money into the husband’s account, and that he then would make the payments from that account.
On cross-examination, the husband denied that he and Kittrell were involved in a romantic relationship. He testified that they had shared only one kiss in October 2010. When asked if he had written the February 2011 letter to Kittrell, the husband admitted that he had. The husband admitted that, in that letter, he had professed his love for Kittrell, had described Kittrell as the “love of [his] life,” and had stated that, “every single day for over six months I have been getting up early to cover you in prayer” and to “thank God for you and our love [that] he has blessed us with.” He also had written that “this will be our last Valentine’s Day apart.” The husband had also stated in the letter that he was writing it because Kittrell had asked him for a “love letter.”
The husband also denied that he and Kittrell had ever engaged in a sexual relationship because, he testified, he was “physically incapable” of engaging in sexual intercourse. He admitted that, in the 12 months preceding the trial, he had re *644 peatedly filled prescriptions for “Levitra,” a medication used to treat erectile dysfunction. Although the husband denied that he was capable of sexual intercourse and denied that Levitra had addressed his erectile-dysfunction issue, he explained that he had continued to obtain refills of the medication because his “insurance coverage would end soon.”
Although the husband denied that his severance pay from the church had ended in May 2011, he admitted that he had nothing to establish that it had not terminated as the wife had testified. He also admitted that he had not directly made a mortgage payment on the marital residence since he had moved out in January 2011 and that he had not provided the wife any financial assistance, other than his severance checks, since January 2011.
The husband testified that he did not know the value of the “Stone Gate” lot owned by the parties. He admitted that he had sold the parties’ boat for $8,000, but he did not indicate when that sale had occurred. He denied knowing the location of the parties’ two jet skis. The husband also testified that, since he had left the marital home in January 2011, the wife had not allowed him to return to retrieve any of his personal belongings; he testified that she had changed the locks on the doors to the marital home. The husband also testified that the wife had not accounted for some of his belongings.
Jay Stradley testified that he was a member of the husband’s former church. According to Stradley, he was aware that the husband would have been fired from his position as the senior minister of the church if he had not resigned. Stradley also denied that the wife had not participated in the husband’s ministry; in Strad-ley’s opinion, the wife had performed the role of a minister’s wife.
Stradley, who works as a realtor, had listed the parties’ home for sale. He testified that he had received one offer to purchase the marital home for $160,000 but that the parties had not accepted that offer. Stradley was aware that the parties owed $200,000 or more on their mortgage.
Stradley also testified that the wife had asked him to be present at the marital home one day after the parties’ separation so that the husband could retrieve his personal belongings. Stradley testified that, on the designated day, after the wife had left the marital home, the husband had arrived with the chief of police. According to Stradley, the husband had stayed approximately 30 to 40 minutes and had taken photographs of various items in the marital home, but he had taken only books with him when he left.
The wife was recalled to the stand. She testified that, since the last court hearing, she and several ladies from the church had conducted the estate sale and that, from that sale, she had made a total of $5,196.26. She requested that the trial court allow her to use the money to pay marital bills. The wife also introduced into evidence a list of items that she had placed in storage; she testified that she had not felt comfortable selling the items listed and that a friend had agreed to store them for her. According to the wife, the friend had prepared an itemized list and had placed an estimated value of each item on the list. The husband objected to the values shown on the list; the trial court allowed the list into evidence but indicated that the values shown thereon would be given the appropriate weight.

Analysis

On appeal, the husband challenges the trial court’s judgment as to custody and visitation, the calculation of child support, the division of the marital property, and the award of alimony. We *645 first address the custody issue. The standard by which this court reviews an initial award of custody following the presentation of ore tenus evidence is well settled:
“Alabama law gives neither parent priority in an initial custody determination. Ex parte Couch, 521 So.2d 987 (Ala.1988). The controlling consideration in such a case is the best interest of the child. Id. In any case in which the court makes findings of fact based on evidence presented ore tenus, an appellate court will presume that the trial court’s judgment based on those findings is correct, and it will reverse that judgment only if it is found to be plainly and palpably wrong. Ex parte Perkins, 646 So.2d 46 (Ala.1994). The presumption of correctness accorded the trial court’s judgment entered after the court has heard evidence presented ore tenus is especially strong in a child-custody case. Id.”
Ex parte Byars, 794 So.2d 345, 347 (Ala.2001).
“‘This presumption [accorded to the trial court’s findings of fact based on ore tenus evidence] is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. “In child custody cases especially, the perception of an attentive trial judge is of great importance.” Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, this Court has also stated: “It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.” Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).’
“Ex parte Fann, 810 So.2d 631, 632-33 (Ala.2001).
“In a divorce action between two fit parents, where there has been no prior custody determination and neither parent has voluntarily relinquished custody of the child, the ‘best interest’ of the child is controlling; the parties stand on ‘equal footing’ and no presumption inures to either parent. ““The trial court’s overriding consideration is the children’s best interest and welfare.’”’ Smith v. Smith, 727 So.2d 113, 114 (Ala.Civ.App.1998) (quoting Collier v. Collier, 698 So.2d 150, 151 (Ala.Civ.App.1997), quoting in turn Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994)).
“In considering the best interests and welfare of the child, the court must consider the individual facts of each case:
“ ‘The sex and age of the children are indeed very important considerations; however, the court must go beyond these to consider the characteristics and needs of each child, including their emotional, social, moral, material and educational needs; the respective home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability, mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material and educational needs of the children; the interpersonal relationship between each child and each parent; the interpersonal relationship between the children; the effect on the child of disrupting or continuing an existing custodial status; the preference of each child, if the child is of sufficient age and maturity; the report and recommendation of any expert witnesses *646 or other independent investigator; available alternatives; and any other relevant matter the evidence may disclose.’
“Ex parte Devine, 398 So.2d 686, 697 (Ala.1981).”
Fell v. Fell, 869 So.2d 486, 494-95 (Ala.Civ.App.2003).
The husband argues that the evidence failed to establish that he was a bad or unfit parent and that, as a result, the trial court erred in awarding the wife sole custody of B.L., the parties’ only remaining minor child. The husband, however, misconstrues the discretion afforded to a trial court in determining the best interest of a child in a divorce action; a trial court need not find one parent unfit in order to award the other parent sole custody. See Fell, supra.
The trial court could have construed the evidence as establishing that the husband had chosen to leave the family and his lifelong career because of Kittrell.[4] Additionally, it was undisputed at the hearing that B.L. had suffered anxiety attacks and had required counseling since the husband had moved out of the marital home. It also was undisputed that B.L. had chosen not to spend extended periods with the husband since the parties’ separation and that J.L., the oldest child, had not visited with the husband at all. The evidence also tended to establish that, while the husband had chosen to manage an ice-cream shop, thereby reducing his income by more than 50%, the wife was working three jobs to meet the financial needs of the family, including those of B.L. and J.L.
Considering all the evidence, including B.L.’s emotional state and his relationship with the parties at the time of the divorce, the trial court could have reasonably concluded that an award of sole custody to the wife was appropriate. See Fell, supra. Because the trial court’s award of sole custody to the wife is supported by sufficient evidence, it is not plainly and palpably erroneous and we must affirm it.
The husband also asserts that the trial court erred in failing to award him an established visitation schedule with B.L. and that, as a result, the judgment must be reversed. The husband, however, failed to raise this argument before the trial court either in his Rule 59 post-judgment motion or at the hearing on that motion. Therefore, the husband’s argument has not been properly preserved for appellate review. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (“This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”); and Etherton v. City of Homewood, 700 So.2d 1374, 1377-78 (Ala.1997) (“Tt is a fundamental rule of appellate procedure that, regardless of [the] merits of [the] appellant’s contentions, appellate courts will not review questions not decided by the trial court.’ ” (quoting Bevill v. Owen, 364 So.2d 1201, 1203 (Ala.1979))). See also Gotlieb v. Collat, 567 So.2d 1302, 1304 (Ala.1990) (“This Court cannot put a trial court in error for failing to consider evidence or accept arguments that, according to the record, were not presented to it.”).
The husband next asserts that the trial court erred in its calculation of child support. He challenges the amount of income the trial court attributed to the wife and to *647 him for purposes of calculating child support pursuant to Rule 82, Ala. R. Jud. Admin. In its judgment, the trial court imputed income to the husband of $8,000 per month, or $36,000 per year, and attributed an income to the wife of $2,408 per month, or $28,896 per year.
We agree with the husband that the trial court’s income figure of $2,408 per month for the wife is unsupported by the evidence. The wife testified that, at the time of the hearing, she was earning $30,000 from her full-time position at Calvary Christian Learning Center, or $2,500 per month. The wife also testified that she was working two part-time jobs, earning $187.50 per month from one part-time job and an additional $208.33 per month from the other.[5] Thus, at the time of the final hearing, the wife’s total gross monthly income was $2,895.83. Because the evidence established that the wife’s gross monthly income was $2,895.83, we conclude that the trial court erred in using an income of $2,408 per month for the wife in its child-support calculation.
The husband also challenges the trial court’s imputation of income to him of $36,000 per year, or $3,000 per month. He argues that the wife presented no testimony or other evidence to establish that he was underemployed. We disagree. “[T]he determination that a parent is voluntarily unemployed or underemployed ‘is to be made from the facts presented according to the judicial discretion of the trial court.’” Clements v. Clements, 990 So.2d 383, 394 (Ala.Civ.App.2007) (quoting Winfrey v. Winfrey, 602 So.2d 904, 905 (Ala.Civ.App.1992)).
From the evidence presented, the trial court could reasonably have concluded that the husband had been asked to resign from his position as senior minister of Christian Life Church, where he was earning $7,300 per month, because of his improper involvement with Kittrell. Although the husband testified before the trial court that he could work again as a minister, he admitted that he had not sought such a position. Although the husband acknowledged that he had had a more lucrative employment opportunity in Birmingham, he testified that he had not pursued that position. While the wife had taken two additional jobs after the parties’ separation to supplement her income, the husband’s testimony established that he had not sought any employment other than at Kittrell’s ice-cream shop, where he was earning only $2,253 per month at the time of the trial. Based on the evidence, the trial court was well within its discretion in finding the husband to be underemployed and in imputing an income of $3,000 per month to him.
Using $2,895.83 and $3,000 as the monthly gross incomes for the wife and the husband, respectively, their combined monthly gross income totals $5,895.83. The child-support guidelines of Rule 32, Ala. R. Jud. Admin., yield a monthly child-support amount for one child of $814. The husband’s percentage of that child-support obligation is 51% or $415.14. Because the trial court’s award of $438 per month in child support exceeds the amount established under the guidelines when using the parties’ appropriate incomes, because the trial court provided no grounds for deviating from the guidelines, and because we can discern no basis for that deviation, we must reverse the trial court’s child-support award.
*648 The husband next asserts that the trial court’s property division and its award of periodic alimony were inequitable.
“When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment as to that evidence is presumed correct on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong. Roberts v. Roberts, 802 So.2d 230, 235 (Ala.Civ.App.2001); Parrish v. Parrish, 617 So.2d 1036, 1038 (Ala.Civ.App.1993); and Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). A property division is required to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court. Parrish, 617 So.2d at 1038.”
Stone v. Stone, 26 So.3d 1232, 1236 (Ala.Civ.App.2009).
“The issues of property division and alimony are interrelated, and they must be considered together. Albertson v. Albertson, 678 So.2d 118 (Ala.Civ.App.199[5]). A property division is not required to be equal, but it must be equitable. Golden v. Golden, 681 So.2d 605 (Ala.Civ.App.1996). In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages and health; the length of the parties’ marriage; and the source, value, and type of marital property. Robinson v. Robinson, [795 So.2d 729 (Ala.Civ.App.2001)]; Lutz v. Lutz, 485 So.2d 1174 (Ala.Civ.App.1986). In addition, the trial court may also consider the conduct of the parties with regard to the breakdown of the marriage, even where the parties are divorced on the basis of incompatibility, or, as here, where the trial court failed to specify the grounds upon which it based its divorce judgment. Ex parte Drummond, 785 So.2d 358 (Ala.2000); Myrick v. Myrick, 714 So.2d 311 (Ala.Civ.App.1998); Lutz v. Lutz, supra.”
Pate v. Pate, 849 So.2d 972, 976 (Ala.Civ.App.2002).
Based on our review of the trial court’s judgment, it appears that the trial court ordered the following. Because the marital home had been lost to a foreclosure, neither party was awarded possession of that home and neither party received any equity from or was assigned debt associated with that home. The trial court ordered the “Stone Gate” lot, held jointly by the husband and the wife, to be sold and the proceeds from that sale to be split evenly between the parties. Each party received their respective automobiles, and the trial court awarded the vehicles driven by the parties’ children to the wife; the trial court also awarded the wife the parties’ two four-wheelers, which the parties had indicated they wished the children to receive.[6] The parties also were ordered to file a joint 2010 income-tax return and to evenly split any refund; they also were ordered to split the credit-card debt addressed at the hearing.
The trial court allowed the wife to sell the contents of the marital home and ordered the proceeds to be divided evenly between the parties; the husband’s share of those proceeds, however, was to be applied to his child-support arrearage. The trial court also ordered the wife to sell the personal property that was held in storage, *649 to divide the proceeds of that sale evenly between the two parties, and to apply the first $916 of the husband’s share to his remaining child-support arrearage; the trial court further specified that any proceeds from the husband's share remaining after applying $916 to his child-support arrearage would be awarded to the wife as a property settlement.
Based on the above, it appears that the vast majority of the parties’ marital property was distributed equally between the parties. “The division of property does not have to be equal, only equitable.” Johnson v. Johnson, 565 So.2d 629, 680 (Ala.Civ.App.1989). The trial court made no award regarding the marital home because that property had been lost to a foreclosure. The husband argues that the trial court should have allowed him a credit or a setoff for the wife’s alleged improper handling of the marital home and his severance checks. He asserts that his severance checks were sent directly to the wife and that she was expected to make the mortgage payments with those funds but that she failed to do so.[7]
The wife testified that she had received severance checks only from February to May 2011, that she had received less than she had expected in those checks, and that her income had been insufficient to allow her to continue making the $2,700 monthly mortgage payments during the pendency of the divorce action. The husband admitted that, other than his severance checks, he had not provided the wife with any funds or paid any of the marital debts since he had left the marital home in January 2011.
It is the duty of the trial court rather than this court to resolve issues arising from conflicting evidence. See Young v. Young, 515 So.2d 32, 33 (Ala.Civ.App.1987). As the trier of fact, the trial court was entitled to determine from the disputed evidence whether the wife had acted improperly in failing to make the monthly mortgage payments. Under the particular circumstances of this case, we cannot conclude that the trial court exceeded its discretion in finding that both parties were responsible for the loss of the marital home and that no adjustment in the division of the marital estate was necessary. As a result, the trial court did not exceed its discretion in finding that the husband was not entitled to a credit or a setoff for the loss of the marital home.
The husband’s arguments regarding the Stone Gate lot are confusing at best. The trial court’s judgment ordered the parties to sell the lot and to split the proceeds. In his reply brief, the husband asserts that the lot had been deeded to the parties’ children and also that the lot had been lost in a foreclosure. The transcript supports neither of those assertions.
“It is well settled that ‘an appellate court is limited to a review of the record, and the record cannot be changed, altered, or varied on appeal by statements in briefs of counsel.’ Quick v. Burton, 960 So.2d 678, 680-81 (Ala.Civ.App.2006) (citing Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000), and Gotlieb v. Collat, 567 So.2d 1302, 1304 (Ala.1990)). This court cannot presume error or the existence of facts to which the record is silent. Id. Also, this court must conclusively presume that the evidence not contained in the record on *650 appeal supports the trial court’s judgment. Sartin v. Sartin, 678 So.2d 1181, 1188 (Ala.Civ.App.1996).”
J.B. v. Cleburne Cnty. Dep’t of Human Res., 992 So.2d 34, 40 (Ala.Civ.App.2008). We, therefore, do not address the husband’s arguments, raised in his reply brief, regarding the Stone Gate lot.
The husband also asserts that the trial court erred in awarding the wife $1,000 per month in periodic alimony. He asserts that the wife failed to provide evidence of her expenses and to establish a need for alimony, or to establish that the husband had the financial ability to pay alimony.
In Shewbart v. Shewbart, 64 So.3d 1080 (Ala.Civ.App.2010), this court addressed at length the principles applicable to an award of periodic alimony.
“This court and our supreme court have enumerated the many factors trial courts must consider when weighing the propriety of an award of periodic alimony, Edwards v. Edwards, 26 So.3d 1254, 1259 (Ala.Civ.App.2009), which include: the length of the marriage, Stone v. Stone, 26 So.3d 1232, 1236 (Ala.Civ.App.2009); the standard of living to which the parties became accustomed during the marriage, Washington v. Washington, 24 So.3d 1126, 1135-36 (Ala.Civ.App.2009); the relative fault of the parties for the breakdown of the marriage, Lackey v. Lackey, 18 So.3d 393, 401 (Ala.Civ.App.2009); the age and health of the parties, Ex parte Elliott, 782 So.2d 308, 311 (Ala.2000); and the future employment prospects of the parties, Baggett v. Baggett, 855 So.2d 556, 559 (Ala.Civ.App.2003). In weighing those factors, a trial court essentially determines whether the petitioning spouse has demonstrated a need for continuing monetary support to sustain the former, marital standard of living that the responding spouse can and, under the circumstances, should meet. See Gates v. Gates, 830 So.2d 746, 749-50 (Ala.Civ.App.2002); Hewitt v. Hewitt, 637 So.2d 1382, 1384 (Ala.Civ.App.1994) (‘The failure to award alimony, although discretionary, is arbitrary and capricious when the needs of the wife are shown to merit an award and the husband has the ability to pay.’).
“A petitioning spouse proves a need for periodic alimony by showing that without such financial support he or she will be unable to maintain the parties’ former marital lifestyle. See Pickett v. Pickett, 723 So.2d 71, 74 (Ala.Civ.App.1998) (Thompson, J., with one judge concurring and two judges concurring in the result). As a necessary condition to an award of periodic alimony, a petitioning spouse should first establish the standard and mode of living of the parties during the marriage and the nature of the financial costs to the parties of maintaining that station in life. See, e.g., Miller v. Miller, 695 So.2d 1192, 1194 (Ala.Civ.App.1997); and Austin v. Austin, 678 So.2d 1129, 1131 (Ala.Civ.App.1996). The petitioning spouse should then establish his or her inability to achieve that same standard of living through the use of his or her own individual assets, including his or her own separate estate, the marital property received as part of any settlement or property division, and his or her own wage-earning capacity, see Miller v. Miller, supra, with the last factor taking into account the age, health, education, and work experience of the petitioning spouse as well as prevailing economic conditions, see DeShazo v. DeShazo, 582 So.2d 564, 565 (Ala.Civ.App.1991), and any rehabilitative alimony or other benefits that will assist the petitioning spouse in obtaining and maintaining gainful employment. See Treusdell v. Treusdell, *651 671 So.2d 699, 704 (Ala.Civ.App.1995). If the use of his or her assets and wage-earning capacity allows the petitioning spouse to routinely meet only part of the financial costs associated with maintaining the parties’ former marital standard of living, the petitioning spouse has proven a need for additional support and maintenance that is measured by that shortfall. See Scott v. Scott, 460 So.2d 1331, 1332 (Ala.Civ.App.1984).
“Once the financial need of the petitioning spouse is established, the trial court should consider the ability of the responding spouse to meet that need. See Herboso v. Herboso, 881 So.2d 454, 458 (Ala.Civ.App.2003). The ability to pay may be proven by showing that the responding spouse has a sufficient separate estate, following the division of the marital property, see § 30-2-51 (a), Ala. Code 1975, and/or sufficient earning capacity to consistently provide the petitioning spouse with the necessary funds to enable him or her to maintain the parties’ former marital standard of living. Herboso, supra. In considering the responding spouse’s ability to pay, the trial court should take into account all the financial obligations of the responding spouse, including those obligations created by the divorce judgment. See O’Neal v. O’Neal, 678 So.2d 161, 164 (Ala.Civ.App.1996). The trial court should also consider the impact an award of periodic alimony will have on the financial condition of the responding spouse and his or her ability to maintain the parties’ former marital lifestyle for himself or herself. Id. A responding spouse obviously has the ability to pay if the responding spouse can satisfy the entirety of the petitioning spouse’s needs without any undue economic hardship. See, e.g., MacKenzie v. Mackenzie, 486 So.2d 1289, 1292 (Ala.Civ.App.1986). In most cases, however, simply due to the fact that, after separation, former spouses rarely can live as well and as cheaply as they did together, Gates, 830 So.2d at 750, a trial court will find that the responding spouse cannot fully meet the financial needs of the petitioning spouse. Walls v. Walls, 860 So.2d 352, 358 (Ala.Civ.App.2003). In those cases, the trial court should endeavor to determine the amount the responding spouse can fairly pay on a consistent basis. See Rubert v. Rubert, 709 So.2d 1283, 1285 (Ala.Civ.App.1998).
“After being satisfied that the petitioning spouse has a need for periodic alimony and that the responding spouse has some ability to meet that need, the trial court should consider the equities of the case. The length of the marriage does not determine the right to, or amount of, periodic alimony. Hatley v. Hatley, 51 So.3d 1031, 1035 (Ala.Civ.App.2010). However, the longer the parties have maintained certain living and financial arrangements, the more fair it will seem that those arrangements should be maintained beyond the divorce to the extent possible. See Edwards v. Edwards, 410 So.2d 91, 93 (Ala.Civ.App.1982). The trial court should also give due regard to the history of the marriage and the various economic and non-economic contributions and sacrifices made by the parties during the marriage. See Hanna v. Hanna, 688 So.2d 887, 891 (Ala.Civ.App.1997). In light of those factors, the trial court should endeavor to avoid leaving the parties in an unconscionably disparate financial position. Jones v. Jones, 596 So.2d 949, 952 (Ala.Civ.App.1992). However, the trial court can consider whether the marriage, and its attendant standard of living, ended due to the greater fault of one of the parties, and, if so, the trial court can adjust the award accordingly. *652 Yohey v. Yohey, 890 So.2d 160, 164-65 (Ala.Civ.App.2004). Lastly, the trial court should consider any and all other circumstances bearing on the fairness of its decision. See Ashbee v. Ashbee, 481 So.2d 1312, 1313-14 (Ala.Civ.App.1983).”
Shewbart, 64 So.3d at 1087-89.
We must agree with the husband that the wife failed to establish a need for periodic alimony. The wife’s evidence failed to establish the standard of living to which the parties had become accustomed during the marriage and her postdivorce needs. The only testimony the wife provided regarding her expenses after the divorce was that her rent would be $1,000 per month. Without some general idea of the wife’s other monthly expenses, it is impossible to know the extent, if any, of the wife’s need for periodic alimony. Shewbart, supra. We, therefore, must conclude that the trial court exceeded its discretion in ordering the husband to pay periodic alimony to the wife in the amount of $1,000 per month.

Conclusion

We affirm the trial court’s judgment as to the award of custody of B.L. to the wife and the husband’s visitation schedule. We reverse the trial court’s judgment as to the child-support calculation and the award of periodic alimony to the wife, and we remand the cause to the trial court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMAS, J., concurs in the result, without writing.

. The parties' oldest child, J.L., had reached the age of majority before the entry of the final judgment.

. Our calculations regarding the amount of the husband’s child-support arrearage differ from the trial court’s calculations. Using the trial court’s figures for the husband’s total arrearage, we calculate $2,200 (September 2011 arrearage) + $1,314 (June, July, and August 2011 arrearage) = $3,514 (total child-support arrearage). After crediting one-half of the proceeds received from the sale of the contents of the marital home ($2,528.15) to the husband’s total arrearage ($3,514), the unpaid balance of the husband's child-support arrearage equals $985.85 ($3,514 — $2,528.15 = $985.85).

. In May 2012, the wife moved to enforce the final judgment and for a finding of contempt against the husband. She asserted that the husband had not complied with the requirements of the trial court’s January 12, 2012, order, setting the amount of the supersedeas bond and that he had failed to pay periodic alimony as ordered in the trial court's final judgment.

. A trial court may consider evidence of adultery in fashioning a divorce judgment even when it does not rely on adultery as the basis for granting the divorce. See, e.g., Shewbart v. Shewbart, 64 So.3d 1080 (Ala.Civ.App.2010) (addressing periodic alimony); and Ex parte Drummond, 785 So.2d 358 (Ala.2000) (addressing a property division).

. Because no documentation was offered to establish the total amount that the wife had earned from her part-time employment, we have attributed income at the rate stated by her for 50 weeks of 2011.

. The trial court instructed the parties to transfer title of the vehicle driven by the oldest child to him.

. The husband moved for a finding of contempt against the wife based on his allegation that the wife had violated the trial court’s status quo order. The trial court, however, denied that motion.